PAUL, REICH & MYERS, P.C.
By:  Robert E. Paul, Esquire
Identification No. 21252
1608 Walnut Street, Suite 500           Attorney for Plaintiff
Philadelphia, PA  19103
(215) 735-9200

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL SECTION:  TRIAL DIVISION

| | | |
|---|---|---|
| **ALICE AND GEORGE A. PERRY,** | § | **CIVIL DIVISION** |
| **Co-Administrators of the Estate of George** | § | |
| **Perry, and** | § | |
| **ALICE PERRY in her own right** | § | |
| | § | **NO. 95-CV-01996** |
| **v.** | § | |
| | § | |
| **A.W. CHESTERTON, et al.** | § | |
| | § | |
| | § | |

## ANSWER TO MOTION OF RAILROAD
## FRICTION PRODUCTS CORPORATION BASED ON PRE-EMPTION

The action is not pre-empted.  The motion should be denied.

PAUL, REICH & MYERS, P.C.

BY: _____
ROBERT E. PAUL

PAUL, REICH & MYERS, P.C.
By:  Robert E. Paul, Esquire
Identification No. 21252
1608 Walnut Street, Suite 500                    Attorney for Plaintiff
Philadelphia, PA  19103
(215) 735-9200

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL SECTION:  TRIAL DIVISION

| | | |
|---|---|---|
| **ALICE AND GEORGE A. PERRY,** | § | **CIVIL DIVISION** |
| **Co-Administrators of the Estate of George** | § | |
| **Perry, and** | § | |
| **ALICE PERRY in her own right** | § | |
| | § | **NO. 95-CV-01996** |
| **v.** | § | |
| | § | |
| **A.W. CHESTERTON, et al.** | § | |
| | § | |
| | § | |

## MEMORANDUM OF LAW

### I.      FACTS

The two coworkers in this case, Valentine and Clarke, testified that the sole exposures to asbestos of Perry arose in the context of rail cars, not locomotives.  Valentine worked on the docks for the railroad as a longshoreman from 1955 or 1957-1971 (Exhibit A NT 28).  Valentine saw Perry working on and with rail cars (Exhibit A 30-32) and with asbestos brakes on the rail cars (Exhibit A 34-37, 38-41, 42) and saw boxes of Railroad Friction brake shoes (Exhibit A 56-64, 67-77).  James Clarke worked for the railroad from 1955-1968 (Exhibit B 15-17) as a brakeman and freight handler.  Clarke recalled seeing Perry 5 months a year over the 13 years at the railroad (Exhibit B 17-18, 26-30).  In that position they worked only on rail cars (Exhibit B

19-22) 4-5 months a year (Exhibit A NT 133).[1]  As such this case is very different from *Corson* in that there is no locomotive exposure at all.  With this background the issues can be discussed.

II.     *Kurns* only applies to Appurtenances of Locomotives not brakes on rail cars

The sole issue decided in *Kurns* was that state law claims for defective design and failure to warn on locomotives are pre-empted by the Locomotive Inspection Act 132 Sct 1261, 1265.  The act only applies to parts and appurtenances of locomotives id.  Thus, once the asbestos dust leaves or never reaches the locomotive the asbestos was not an appurtenance when it caused the injury.  Second, where the asbestos product was not involved with a locomotive at all the *Kurns* opinion does not affect the claims at all.  My opponents seek to argue that *Kurns* bars all claims against anyone who had anything to do with railroads.  It bars only state law claims against appurtenances to locomotives.

The significance of attachment to, and becoming an integral part of, the locomotive or lack thereof has since made clear in other cases such as *Varney v. Norfolk & W.R. Co.,* 899 F.Supp 280 (S.D.W.V. 1995), in which the plaintiff was injured when he removed a radio from its housing in one locomotive to install it in another locomotive.  He was injured when the strap on the radio broke as he was carrying it.  The District Court held that once the radio was removed from the locomotive, it was no longer an "appurtenance" of the locomotive, and therefore, the injury was not covered by the BIA, even though it was intended to be installed in another locomotive, Id. at 28.  Therefore, any product not attached to the locomotive would not yet be an appurtenance or had ceased to be one.   Here dust escaping from products installed on railcars cannot be appurtenant to a locomotive.

The most recent case defining an appurtenance to a locomotive is *Milesco v. Norfolk S.*

---

[1] The motion on product exposure has been denied.

*Corp.,* 807 F.Supp.2d 214 (M.D. Pa 2011), in which the defendants moved to dismiss plaintiff's claim based on alleged federal preemption pursuant to the Third circuit decision in *Kurns*. The object involved was a gas return cushion unit to be scrapped. The cushion unit had not been properly vented of its gas after removal, and exploded. The plaintiff was injured by the gas cushion unit before it was scrapped. The District court held that the seat was not an appurtenance after it had been removed. Citing the Third circuit's ruling in *Kurns, Milesco* held that once the cushion unit was removed from the car, it was not an appurtenance 807 F.Supp.2d at 222[2]. Where an asbestos product is not ever attached to a locomotive or part of a locomotive the BIA is inapposite and thus *Kurns* is irrelevant to this case. Brakes on railcars have nothing to do with locomotives. The point, which we have argued to the Superior Court of Pennsylvania in the reconsideration of *Atwell v. John Crane* mandated by the Supreme Court in *Kurns* is that if the asbestos dust is not attached to the locomotive but released with installation or removal it is not an appurtenance and there is no pre-emption even in locomotive cases. This case does not even involve locomotives.

III.   **The Safety Appliance Act which Governs This case was not at issue in** *Kurns*

*Kurns* never addressed claims pursuant to the Safety Appliance Act ("SAA"), 49 U.S.C.§20302 (1994). The effect of *Kurns* is that while the field of equipment attached to locomotive is preempted by BIA, the field of state law claims relating to all railroad equipment is still not preempted by the SAA, as remedies for violation of the SAA[3] standards are left to state

---

[2] In *Monheim v. Union R. Co.,* 788 F.Supp.2d 394 (W.D. Pa. 2011), another District Court also held that the equipment must be attached to the locomotive to be an appurtenance 788 F.Supp.2d at 402. *Monheim* also held that simply being attached to the locomotive did not make an appurtenance an essential part of the locomotive. Id. at 400-401. The District Court allowed the negligence claims to proceed, despite preemption of certain BIA and SAA claims.

[3] The Code of Federal Regulations currently defines a locomotive as: "Locomotive means a piece of on-track equipment other than hi-rail, specialized maintenance, or other similar equipment (1) With one or more propelling motors designed for moving other equipment; (2)Without one or more propelling motors designed to carry freight or

law. *Kurns* only reiterated the ruling in *Napier v. Atlantic Coast R. Co.,* 272 U.S. 605 (1926), in which the Court held that state regulations on locomotive equipment were preempted by the BIA because, "The federal and state statutes are directed to the same subject – the equipment of locomotives." *Napier,* 272 U.S. at 612[4]. The *Napier* court held the BIA preempted state law as to claims relating to injuries from locomotive equipment, but that the SAA did not preempt state law as to claims relating from locomotive equipment, but that the SAA did not preempt state court claims based on the SAA. "Does the legislation of Congress manifest the intention to occupy the entire field of regulating locomotive equipment?  Obviously it did not do so by the Safety Appliance Act, since its requirements are specific." *Napier,* 272 U.S. at 611.

The Safety Appliance Act is limited to certain appliances and applies to brakes on locomotives only to ensure the engineer can operate them from the cab.  The Jurisprudence under the Safety Appliance Act limits preemption rather than expands preemption.  *Napier* itself holds that the Safety Appliance Act is limited in the devices it regulates and subsequent cases have limited preemption.  A court in Massachusetts, *Mancer v. Metropolitan Life* (Exhibit C) held that the Locomotive Inspection Act does not apply to brake shoes on rail cars as they are by definition not appurtenances to locomotives.  I note your opinion in the Glasser cases against Pullman (Exhibit D).  This suggests the analysis that *Kurns* is very limited in scope is well founded.

**IV     Relevant Legislative History, Common to Motions Filed by American Standard and Railroad Friction Products**

The regulation of safety on railroad equipment began with state law. *See New York, N.H. & H.R. Co. v. New York,* 165 U.S. 628, 17 S.Ct. 418 (1897) (State law prohibiting certain

---

passenger traffic or both; or (3) Without propelling motors but with one or more controls strands." 49 C.F.R. 229.5 (2008).

passenger car heating equipment was not a violation of the Commerce Clause.).   State law provided remedies for injured railroad workers, including those engaged in repair and maintenance work.  *See Chicago, M. & St. P. Ry. Co. v. Artery*, 137 U.S. 507, 510-11, 11 S.Ct. 129 (1890).

Beginning in 1893, Congress enacted the first[5] federal railroad safety of laws, known collectively as the Safety Appliance Act ("SAA").  *See* Act of Mar. 2, 1893, ch. 196, 27 Stat. 531, as amended by Act of Mar. 2, 1903, ch. 976, 32 Stat. 943, as supplemented by Act of Apr. 14, 1910, ch. 160, 36 Stat. 298 (codified as amended at 49 U.S.C. §§ 20301-20306).  The Safety Appliance Act named certain locomotive and car components and required railroads to maintain these appliances on locomotives and cars used on their lines.  The Act included only couplers, sill steps, ladders, running boards, handholds, grab irons, drawbars, and power brakes (as opposed to hand brakes).[6]   (49 U.S.C. § 20302(a)).   The power brake (or train brake) is the

---

[4]

[5] Being the first federal railroad safety act, the Safety Appliance Act was passed in a domain which until then was regulated exclusively by state law, with no history of federal regulation.  As such, preemption under the Act is not presumed.

[6] (a) General. - Except as provided in subsection (c) of this section and section 20303 of this title, a railroad carrier may use or allow to be used on any of its railroad lines -
(1) a vehicle only if it is equipped with -
(A) couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles;
(B) secure sill steps and efficient hand brakes; and
(C) secure ladders and running boards when required by the Secretary of Transportation, and, if ladders are required, secure handholds or grab irons on its roof at the top of each ladder;
(2) except as otherwise ordered by the Secretary, a vehicle only if it is equipped with secure grab irons or handholds on its ends and sides for greater security to individuals in coupling and uncoupling vehicles;
(3) a vehicle only if it complies with the standard height of drawbars required by regulations prescribed by the Secretary;
(4) a locomotive only if it is equipped with a power-driving wheel brake and appliances for operating the train-brake system; and
(5) a train only if -
(A) enough of the vehicles in the train are equipped with power or train brakes so that the engineer on the locomotive hauling the train can control the train's speed without the necessity of brake operators using the common hand brakes for that purpose; and

system that allows the brakeman to operate brakes for the entire train from his seat on the locomotive, and the Act makes no reference to the brake shoes.

In 1911, Congress enacted the Boiler Inspection Act to regulate locomotive boilers, which had not been included as enumerated devices in the Safety Appliance Act.  Act of Feb. 17, 1911, ch. 103, § 2, 36 Stat. 913.  In 1915, Congress amended the Boiler Inspection Act to cover "the entire locomotive and tender and all parts and appurtenances thereof."  Act of Mar. 4, 1915, ch. 169, § 1, 38 Stat. 1192 (codified as amended at 49 U.S.C. § 20701-20703).[7]  No similar amendment was made to the Safety Appliance Act, and the Act remained applicable to a limited list of appliances.  Following the amendment, the Boiler Inspection Act became known as the Locomotive Inspection Act.

Even after the adoption of the Locomotive Inspection Act and Safety Appliance Act, the states continued to regulate conditions in the railroad industry, including the safety of railroad cars.  Fifty years after the first provision of the Safety Appliance Act became law, the Supreme Court recognized that "State laws have long regulated a great variety of conditions in transportation and industry." *Terminal R. Ass'n v. Brotherhood of RR Trainmen*, 318 U.S. 1, 6-7, 63 S.Ct. 420, 87 L.Ed. 571 (1943).  This included the protection of railroad workers' health and safety on railroad cars.  *Id.*, at 8.  That case specifically held there was no pre-emption unless the

---

(B) at least 50 percent of the vehicles in the train are equipped with power or train brakes and the engineer is using the power or train brakes on those vehicles and on all other vehicles equipped with them that are associated with those vehicles in the train.  (49 U.S.C. § 20302).

[7] A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances--
(1) are in proper condition and safe to operate without unnecessary danger of personal injury;
(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
(3) can withstand every test prescribed by the Secretary under this chapter.
(49 U.S.C. § 20701)

government had issued regulation covering the subject matter.

In 1969, Congress recognized that regulation under the Locomotive Inspection Act and Safety Appliance Act was narrow and; it concluded that "the railroad industry is the only mode of transportation in the United States which presently is not subject to comprehensive Federal safety regulations." S. Rep. 91-619, at 1 (1969). Congress further found that "scant attention ha[d] been paid to railroad safety...at the . . . Federal level[]" and that the existing "rail safety statutes" – including the Locomotive Inspection Act and the Safety Appliance Act – applied only "to some very specific safety hazard[s]." *Id.*, at 4; *accord* H.R. Rep. 91-1194, at 8 (1970) (The existing federal railroad safety statutes "met only certain and special types of railroad safety hazards."). Thus, Congress adopted the Federal Railroad Safety Act of 1970 ("FRSA"), Pub. L. No. 91-458, 84 Stat. 971. (codified as amended at 49 U.S.C. § 20101). The FRSA filled in the gaps left unregulated by the Locomotive Inspection Act and the Safety Appliance Act, providing that the Secretary of Transportation "shall . . . prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety." *Id.* § 202(a) (codified as amended at 49 U.S.C. § 20103(a)). When it adopted the FRSA, Congress included a state-law savings clause, recognizing the states' authority to continue to regulate railroad safety. *Id.* § 205 (codified as amended at 49 U.S.C. § 20106(a)(2)).

## V.     The Jurisprudence under the Safety Appliance Act Allows the case to proceed even if SAA Governs or preempts

In *Gilvary v. Cuyahoga Valley Ry Co.* 292 US 57 (1934) plaintiff sued under the SAA for violation of SAA coupling regulations. The Court held SAA preempted but that the right to recover damages through the breach of the SAA was at state law:

> While they [meaning the Safety Appliance Act] prescribe the duty,
> the right to recover damages sustained by the injured employee

8

> through the breach "sprang from the principle of the common law" and was left to be enforced accordingly, or in case of death "according to the applicable statute." These Acts do not create, prescribe the measure or govern the enforcement of, the liability arising from the breach. They do not extend to the field occupied by the state compensation Act. There is nothing in the agreement repugnant to them.

> Id. at 62. (Citations omitted).

Subsequently in *Tipton v. Atchison, Topeka & S.F.R. Co.*, 298 U.S. 141 (1936), the Court held that the SAA, unlike the Federal Employees Liability Act, left the nature and incidents of remedy for violation of the SAA to state law. The SAA merely removed assumption of risk as a defense, according to the *Tipton* court, but the SAA did not touch the common or statute law of a state governing venue, limitations, contributory negligence or recovery for death by wrongful act. "California is at liberty to afford any appropriate remedy for breach of the duty imposed by the Safety Appliance Acts. Her choice in the matter raises no federal question and the federal courts are as much bound as those of California to conform to the remedial procedure she has adopted." *Tipton*, 298 U.S. at 149.[8]

One year after *Tipton*, in *Atchison, Topeka & Santa Fe Ry v. Scarlett*, 300 U.S. 471 (1937), the Supreme Court ruled in the case of injured worker Scarlett, who was a brakeman who slipped on a brace rod attached to a railcar behind the ladder while descending from a boxcar by a ladder. Scarlett argued that the strict liability rule of the SAA was involved in the case. IN reversing judgment for Scarlett, the Supreme Court held that the rod was not a part of the ladder. The Supreme Court then went on to hold:

> The right of recovery, if any, must therefore rest upon the effect of the

---

[8] *Tipton*, 298 U.S. at 147-148, quoted the earlier case of *Moore v. Chesapeake & O.R. Co.*, 291 U.S. 205 (1934), for the proposition that the SAA does not give a right of action, but leaves the genesis and regulation of remedies under the SAA to the law of the states.

> near proximity of the ladder to the rod, neither being in itself defective.
> The law to be applied to that situation is the common-law rule of
> negligence and not the inflexible rule of the Safety Appliance Act
> and the questions to be answered are whether the appliances were
> maintained in such relation to one another as to constitute negligence
> on the part of the company and, if so, whether Scarlett assumed the risk…

Id. at 475

While it barred the strict liability claim under the SAA, the *Scarlett* court still allowed the

negligence claim to proceed under state law.

In *Breisch v. Central R of New Jersey,* 312 U.S. 484 (1941) the plaintiff sued the railroad

for violation of the SAA for failure to furnish efficient hand brakes for a car. He recovered

damages, but the Third Circuit held that because he was engaged in interstate commerce,

plaintiff's only remedy was in Pennsylvania workers' compensation. On appeal, the Supreme

Court held that it was clear that an employee injured in interstate commerce by defective

equipment came under the SAA. The Supreme Court then stated: "Nor is there any longer a

question as to the power of the state to provide whatever remedy it may choose for breaches of

Safety Appliance Acts. The federal statutes create the right; the remedy is within the state's

discretion." 312 U.S. at 486.[9] Thus, the Supreme Court has clearly permitted state law claims for

damages for violation of SAA or for negligence even when the SAA was complied with.[10]

*Kurns* Makes no change in the law under the SAA, but rather continues the law in effect. Thus,

if the SAA preempted the area of railroad brake shoes Plaintiff can sue for violation of SAA

requirement of safe brakes in state law claims even if there were no federal regulation requiring

warnings. See e.g. *Myers v. Reading Co.* 331 U.S. 477 (1947). The SAA language allow such

---

[9] The Supreme court went on to hold that workers compensation was not the sole remedy and allowed the verdict against the railroad to stand, noting that Pennsylvania allowed the claim to be brought in court rather than in workers compensation.

cases even if no federal regulation applies and SAA preempts. The SAA only preempts certain equipment and the shoes are not one of the delineated devices. Thus, there is no pre-emption under the SAA.

### VI.    Plaintiffs sought the Government's assistance as required by *Napier* in removing preemption

The Federal Railway Administration ("FRA") argued as *amicus* in *Kurns* that there was no federal bar to the types of claims herein. *Napier* held that if the states wanted permission to regulate despite pre-emption they should seek permission from the Government. The point is that *Napier* provided that if states wanted relief from preemption to issue their regulations they should ask permission to do so. When plaintiffs and the Supreme Court asked the Government's comments on whether preemption barred the claim, the Government agreed on failure to warn only but not on design defect that there is no pre-emption of failure to warn cases. Thus, even if *Napier* governs the case can proceed[11]. *Napier*, of course, does not apply as this is an SAA, not BIA case.

### VII.    The Supreme Court permits States to Regulate Railroad Cars That Cross State Lines, Even If The States Might Impose Different Standards

The Supreme Court has chosen to permit states to regulate safety of equipment on railroad cars, other than the safety appliances specifically enumerated in the Safety Appliance Act, even though the state standard may apply to a car that travels through other states. An early example was in *New York, N.H. & H.R. Co. v. New York, supra,* wherein the Court rejected the argument that the states were barred from regulating the safety of heating equipment in railroad

---

[10] The Supreme Court discussed these issues again in *Crane v. Cedar Rapids & I.C.R. Co.,* 395 U.S. 164 (1969) and cited *Moore* and *Tipton* for the proposition that violation of the SAA is remedied by state law.
[11] As highlighted in *Myers v. Reading Co.,* 331 U.S. 477 (1947), the Supreme Court has previously allowed suits to proceed for violations of the statutory provision of the SAA requiring "efficient brakes," or barring "unsafe

passenger cars that travel across state lines, "from the city of New York to Hartford and from Hartford to that city." Id., 165 U.S. at 630.  Notwithstanding the subsequent passage of the Safety Appliance Act, the Court affirmed that holding in *Atlantic Coast Line v. Georgia,* 234 U.S. at 280, 34 S.Ct. 829, 58 L.Ed. 1312 (1914).  In that case, the Court upheld a Georgia law regulating the type of headlight on the front of a train.[12]  The railroad challenging the law argued that "if Georgia may prescribe an electric headlight, other states through which the road runs may require headlights of a different sort; that, for example, some may demand the use of acetylene, and that others may require oil; and that, if state requirements conflict, it will be necessary to carry additional apparatus and to make various adjustments at state lines, which would delay and inconvenience interstate traffic." Id., 234 U.S. at 290.  The Court found the "argument … substantially the same as that which was strongly presented to the court in *New York, N.H. & H.R. Co. v. New York,* …" Id.  The Court upheld "the settled principle that, in the absence of legislation by Congress, the states are not denied the exercise of their power to secure safety in the physical operation of railroad trains within their territory, even though such trains are used in interstate commerce." Id., 234 U.S. at 291.  As further discussed below, the Safety Appliance Act did not prohibit the Georgia law because the headlight was not a piece of equipment specified by the Act.  Id., 234 U.S. at 293.

In *Terminal R. Ass'n v. Brotherhood of RR Trainmen, supra,* the Supreme Court upheld an Illinois requirement for safety equipment on caboose cars, though the cars were found on "trains which move between points in East St. Louis, Illinois, and St. Louis, Missouri, and cross one or the other of two bridges spanning the Mississippi River and the state line." Id. 318 U.S. at

---

locomotives" in the absence of specific regulations as to safety.  Here, since failure to warn makes the brakes shoe unsafe and thus not efficient the SAA permits the claim to continue under *Myers.*

6. The Court acknowledged that "the effect of the order is in some measure to retard and increase the cost of movements in interstate commerce." Id., 318 U.S. at 8. Such inconvenience did "not preclude Illinois from regulating the operation to the limits of its territory." Id., 318 U.S. at 8, 9.

Defendant argues that, because the power to regulate locomotives is intended to be "federally exclusive, 'requirements of states are precluded, however commendable or however different their purpose.'" (Doc. 233, page 5; quoting from *Napier v. Atlantic Coast Line R. Co.,* 272 U.S. 605, 613, 47 S.Ct 207, 71 L.Ed. 432 (1926). This argument, however, has only been extended by the Supreme Court to the Locomotive Inspection Act and the regulation of locomotives under the Act. Even after *Napier,* the Court took a different approach with respect to the Safety Appliance Act and regulation of cars under that Act. *Terminal R. Ass'n v. Brotherhood of RR Trainmen, supra.* The Court found that regulation of railroad cars under the Safety Appliance Act, even for cars that cross state lines, is "federally exclusive" only to the extent regulation concerns devices specifically named within the Act and regulated by it. Id. Otherwise there is no preemption.

### VIII.   Plaintiffs' Claims Are Not Preempted by the Locomotive Inspection Act Because They Do Not Concern Equipment Covered by the Locomotive Inspection Act

State law, such as the Defendants' duty of care owed to Plaintiffs' decedent, is not preempted by a federal act unless the state law "regulates *within* [the act's] exclusively federal domain." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988)(italics original). By "defining the [] scope" of a federal statute at issue, a court is "defining … the scope of the resulting field preemption." *United States v. Locke,* 529 U.S. 89,

---

[12] Though the headlight was usually affixed to the front of a locomotive, this decision was made before adoption of

112, 120 S.Ct. 1135, 146 L.Ed. 2d 69 (2000).  Accordingly, the Locomotive Inspection Act preempts state law regulating railroad equipment only to the extent that the same equipment is regulated under the Locomotive Inspection Act.

The Locomotive Inspection Act does <u>not</u> cover railroad cars. *Alabama & V. Ry. Co. v. Ware,* 92 So. 161 (1922).[13]  Rather, it imposes requirements on the "locomotive or tender and its parts and appurtenances." 49 U.S.C.A.§ 20701.  It covers only "whatever is in fact an integral or essential element of a completed locomotive." *Southern Railway v. Lunsford,* 297 U.S. 398, 401, 56 S.Ct. 504, 80 L.ED. 740 (1936).  In *Kurns v. R.R. Friction Products Crop.,* 132 S.Ct. 1261, 1269 (2012), the Court defined the scope of the field preempted by the Locomotive Inspection Act simply as "the equipment of locomotives". Id., at 1269; quoting *Napier, supra,* 272 U.S. at 612.  As such, the *Kurns* decision did not extend preemption to the equipment relevant in this case, the brake shoes on railroad cars.  If anything, the court's definition of the scope of the act, "the equipment on locomotives", makes it even clearer that the Act does not preempt Plaintiffs' claims.

Because the Locomotive Inspection Act concerns only locomotives and their tenders, any preemption that might arise out of the Act extends only to locomotives and their tenders.  Thus, last month, the court in *Manser v. Metropolitan Life Insurance Co., et al., supra,* correctly recognized that the Locomotive Inspection Act does not cover brake shoes and railroad cars and the Act therefore does not preempt state law claims arising out of injury from brake shoes on

---

the Locomotive Inspection Act, and so only the Safety Appliance Act was at issue.

[13] *Alabama & V. Ry. Co. v. Ware, supra,* concerned whether the Locomotive Inspection Act covered the components of a "trail car" that was designed and constructed for one purpose – to attach to the rear of a locomotive and tender and allow the locomotive to load freight cars onto a vessel.  The locomotive was too heavy to approach the vessel on which it loaded freight cars. Id., at 161.  The lighter trail car allowed the heavy locomotive to keep a distance from the freight cars that it pulled, and it was designed and constructed specifically for this purpose. Id.  The trail car "was never loaded" with freight. Id.  Though the court acknowledged that the trail car served no purpose but to

railroad cars (Exhibit 1).

Plaintiffs' decedent was exposed to asbestos from railroad car components. These components were not "the equipment of locomotives". The railroad car components were not "integral or essential element[s] of a completed locomotive" because the locomotive could operate without the cars in tow. As such, the asbestos exposure that caused Plaintiffs' injuries was not regulated by the Locomotive Inspection Act; and Plaintiffs' state law claims are not preempted by the Locomotive Inspection Act or the Safety Appliance Act.

### IX.   Plaintiffs' Claims Are Not Preempted by the Safety Appliance Act Because They Do Not Concern Equipment Covered by the Safety Appliance Act

The Safety Appliance Act regulates only specifically enumerated devices and not the asbestos-containing materials in railroad car brake shoes. This Court has already recognized that the Safety Appliance Act covers only the particular appliances enumerated in the statute. *Finley v. National Railroad Passenger Corp.,* CIV.A. 95-3594, 1997 U.S. Dist. Lexis 1395, 1997 WL 59322 (E.D.Pa. Feb. 12, 1997). The court found that the railroad car window at issue was not covered by the Safety Appliance Act because the window is not an enumerated "safety appliance":

> The courts of Appeals for the Fourth and Eighth Circuits have concluded that the SAA covers only those items specifically listed in the statute. *Moses v. Union Pac. R.R.,* 64 F.3d 413, 419 (8th Cir.1995) (holding that the Act Does not extend to devices not enumerated in 45 U.S.C.§11); *Jordan,* 970 F.2d at 1354 (holding that the SAA encompasses only those devices listed in 45 U.S.C. § 11). According to these Courts of Appeals, the SAA creates strict liability for malfunctions in specific equipment, and no other device falls within its reach.

Id., at *7. The scope of the Safety Appliance Act, as defined in *Finley,* determines "the scope of the resulting field pre-emption." *United States v. Locke,* 529 U.S. at 112. It follows that the

---

allow the locomotive to load cars onto a boat, it rejected the contention that the trail car was an "appurtenance" of

preempted field covers "only those items specifically listed in the statute." *Finley*, at *7 (citations omitted). More recently, the court in *Manser v. Metropolitan Life Insurance Co., et al, supra,* correctly recognized that the "appliance requirements imposed by the [Safety Appliance Act] do not preempt state tort liability based upon brake-based claims in [that] case." (Exhibit 1).

In *Finley,* this Court adhered to nearly a century of consistent holdings, which limit the scope of preemption under the Safety Appliance Act to the regulation of the appliances enumerated in the Act. In *Atlantic Coast Line v. State of Georgia, supra,* the Supreme Court held that the Safety Appliance Act did not preempt a Georgia statute requiring a particular type of lights on the fronts of locomotives because the Safety Appliance Act did not "provide regulations for locomotive headlights." Id., at 293.[14]

To reach its conclusion in *Atlantic Coast Line v. Georgia,* the Court reviewed the collection of devices specifically identified in the Safety Appliance Act and in the original Boiler Inspection Act:

> Reference is made to the act of March 2, 1983, chap. 196 (27 Stat. at L. 531, U.S. Comp. Stat. 1901, p. 3174), relating to power driving-wheel brakes for locomotives, grab irons, automatic couplers, and height of drawbars; to the act of March 2, 1903, chap. 976 (32 Stat. at L. 943, U. S. Comp. Stat. Supp. 1911, p. 1314), amending the act of 1893; to the act of May 27, 1908, chap. 200 (35 Stat. at L. 324, 325, U.S. Comp. Stat. Supp. 1911, p. 1325) authorizing the Interstate Commerce Commission to keep informed regarding compliance with the safety-appliance act, and to investigate and report on the need of any appliances or systems intended to promote the safety of railway operations; to the act of May 30, 1908, chap. 225 (35 Stat. at L. 476, U.S. Comp., Stat.

---

the locomotive. Id., at 162.
[14] The defendant may attempt to distinguish *Atlantic Coast Line v. Georgia,* arguing that the case involved locomotives and suggesting that the Safety Appliance Act covers only cars. That would be wrong. The same year, the Court specifically found, over the objection of the defendant, that the Safety Appliance Act covers the drawbars on locomotives. *S.R. Co. v. Crockett,* 234 U.S. 725, 738, 34 S.Ct. 897, 902, 58 L.Ed. 1564 (1914). The Court had previously found that the Act covered locomotives." *Johnson v. S. Pac. Co.,* 196, U.S. 1, 15-16, 25 S.Ct. 158, 161, 49 L.Ed. 363 (1904). It was the headlight and not the locomotive that fell outside the scope of the Safety Appliance Act. Here also the Safety Appliance Act does not cover this area of locomotives generally but only requires brakes to be controllable by the engineer and nothing else. This is key under *Napier.*

Supp. 1911, p. 1326), relating to locomotive ash pans; to the act of April 14, 1910, chap. 160 (36 Stat. at L. 298, Comp. Stat. Supp. 1911, p. 1327), relating to sill steps, hand brakes, ladders, running boards, and hand holds, and providing that the Interstate Commerce commission should, after hearing, designate the number, dimensions, location, and manner of application of these appliances, and of those required by the act of 1893; to the detailed regulations prescribed by the Commission, on March 13, 1911, pursuant to this authority; to the act of May 6, 1910, chap. 208 (36 Stat. at L. 350 U.S. comp. Stat. Supp. 1911, p. 1329), requiring the commission to investigate accidents and make report as to their causes, with such recommendations as they may deem proper; and to the act of February 17, 1911, chap. 103 (36 Stat. at L. 913, U.S. Comp. Stat. Supp. 1911, p. 1333), relating to locomotive boilers.

Id.  The court found that "[i]t does not appear, however, either that Congress has acted, or that the Commission, under the authority of Congress, has established any regulation so far as headlights are concerned."  Id.  Thus, regulation of headlights would "be supplied by local authority."  Id., at 294.  Because locomotive headlights were not specifically enumerated appliances in the Safety Appliance Act, the states were free to regulate them.

The outcome in *Atlantic Coast Line v. Georgia* may appear inconsistent with the outcome in *Napier, supra;* but that is only because the *Napier* Court found that state law was preempted by the much more inclusive Locomotive Inspection Act.  *Atlantic Coast Line v. Georgia* was decided before the Locomotive Inspection Act was amended to cover the whole locomotive rather than specific parts, and *Napier* was decided afterward.  In fact, the Supreme Court reaffirmed the holding of *Atlantic Coast Line v. Georgia* in its decision concerning one of two appeals before the Court in *Napier*.

In *Napier*, one appeal was from a decision of the Northern District of Georgia, which held that a Georgia law requiring automatic firebox doors was preempted by the Locomotive Inspection Act.  *Atlantic Coast Line R. Co. v. Napier,* 2 F.2d 891 (N.D.Ga. 1924).  The other

appeal was from the decision of the Supreme Court of Wisconsin, which held that a Wisconsin law requiring cab curtains on locomotives during the winter season was not preempted by federal law. *Chicago & Northwestern Ry. Co. v. Railroad Commission of Wisconsin,* 205 N.W. 932 (Wis. 1927).   In its assignment of errors to the Supreme Court of the United States, the Wisconsin appellant contended that the Wisconsin statute violated the Locomotive Inspection Act **and** the Safety Appliance Act.  (Brief for Plaintiffs in Error, page 20, Exhibit 2).   Regarding the Safety Appliance Act, the appellant asserted:

> The Wisconsin Act and order encroach upon a field of legislation previously occupied by Congress in the passage of the Federal Safety Appliance Acts.

Id.  The Supreme Court recognized that the Safety Appliance Act regulated certain enumerated devices on locomotives.  *Napier,* 272 U.S. at 608 (citations omitted).   However, the Court rejected the argument for field preemption under the Safety Appliance Act:

> Does the legislation of Congress manifest the intention to occupy the entire field of regulation locomotive equipment?  Obviously it did not do so by the Safety Appliance Act, since its requirements are specific.  It did not do so by the original Boiler Inspection Act, since its provisions were limited to the boiler.  *Atlantic Coast Line R. Co. v. Georgia,* 234 U.S. 280, 34 S. Ct. 829, 58 L.Ed. 1312.

*Napier,* 272 U.S. at 611.  The court held that the Safety Appliance Act (like the original Boiler Inspection Act) did not preempt state laws requiring safety devices that were not specifically enumerated in the Act.  The Court's explanation, "since its requirements are specific", is concise; but the Court's citation to *Atlantic Coast Line v. Georgia, Napier* was decided after the Locomotive Inspection Act was extended to the entire locomotive; and preemption under the expanded Locomotive Inspection Act dominated most of the opinion.  The Court's expansive holding with regard to the Locomotive Inspection Act should not be substituted for its clear holding that the Safety Appliance Act did not preempt the same state law.  By reaching different

18

results when applying the Safety Appliance Act versus the Locomotive Inspection Act, the Court underscored the difference between the broad scope of the field preempted by the Locomotive Inspection Act and the narrow field preempted by the Safety Appliance Act.

Even if the facts of the case involve and enumerated safety appliance, that alone is not sufficient to bring the case under the Safety Appliance Act when the subject injury arose out of an alleged defect in something other than the device enumerated in the Act. *Atchison, Topeka & Santa Fe Railway v. Scarlett,* 300 U.S. 471, 57 S.Ct. 541, 81 L.Ed. 748 (1937). In *Scarlett,* a railroad worker was injured when descending a ladder from a box car; and his foot slipped on a slanting brace rod which was immediately behind the ladder. The ladder (an enumerated safety appliance) conformed to the federal regulations promulgated under the Safety Appliance Act, but the allegedly defective brace rod was not an enumerated safety appliance. Id., at 471. Because there was no regulation regarding the proximity of the ladder to the brace rod, there remained an issue to be determined by common law:

> The right of recovery, if any, must therefore rest upon the effect of the near proximity of the ladder to the rod, neither being in itself defective. **The law to be applied to that situation is the common-law rule of negligence, and not the inflexible rule of the Safety Appliance Act**; and the questions to be answered are whether the two appliances were maintained in such relation to one another as to constitute negligence on the part of the company and, if so, whether Scarlett assumed the risk.

Id., at 475 (emphasis added). Defendant cannot establish that Palintiffs' case falls under the Safety Appliance Act unless Defendant can show that Plaintiffs' injuries are alleged to arise from a defect in a device enumerated in the Act. Although brakeshoes on railroad cars are controlled by the power brake system or the hand brake mechanism, the defect at issue in Plaintiffs' claim is the failure to have a warning on the brake shoes themselves, which devices are not enumerated devices under the Safety Appliance Act.

In *Terminal R. Ass'n v. Brotherhood of RR Trainmen,* 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943), the Supreme Court again held that the state requirement was not preempted by the Safety Appliance Act when the state requirement did not regulate one of the enumerated devices. The Illinois Commerce commission had issued an order requiring railroads to furnish cabooses on certain routes, and the order was challenged under the theory or preemption by the Safety Appliance Act. The Supreme Court found that the Safety Appliance Act does not "lay down any requirement that cabooses shall or shall not be used on the runs in question." Id., at 4. Citing *Atlantic Coast Line v. Georgia, supra,* the Court rejected the field preemption argument and affirmed the state order requiring caboose cars. Id. *Terminal Railroad* makes the point that if an item is not appurtenance to a locomotive, or is not an enumerated item under the Safety Appliance there is no preemption unless and until the FRA issues a regulation. Here, of course, the government contended before Supreme Court in *Kurns* that there was no preemption of failure to warn claims. This will be discussed below.

*Terminal R. Ass'n* was followed by the Supreme Court of Iowa in *Fleming v. Richardson,* 24 N.W.2d 280 (1946). At issue was whether the Safety Appliance Act preempted an Iowa state-law requirement for platforms at the ends of cabooses. The Iowa court explained the difference between "safety equipment" and an enumerated safety appliance:

> It is one thing to say that a caboose platform is specified as a safety appliance in the Acts or the order, and something quite different to say that 'it is in the nature of a safety appliance or safety equipment.' The doors and windows, in fact, every part of a caboose is 'in the nature of a safety appliance or safety equipment' because each and all of them conduce to the safety of, and render a protective service, to those in, or using, the caboose, cut that does not bring these parts within the scope or intendment of any of these Acts, or of the order issued thereunder by the Interstate Commerce Commission.

Id., at 282. Caboose platforms are not enumerated devices because they are "neither *expressly*

*designated,* nor *impliedly included* in the Safety Appliance Acts…" Id. (italics in the original). As such, the Iowa requirement was not preempted by the Safety Appliance Act.

Similarly, in *Garay v. Missouri Pacific Railroad Co.,* 38 F.Supp.2d 892 (D. Kan. 1999), the district court explained the difference between "safety equipment" and the specific devices enumerated in the Safety Appliance Act. The survivors of a railroad worker, who suffocated when he fell into a hopper car, brought wrongful death claims against a railcar manufacturer under state common law, alleging that the decedent's suffocation was caused by the absence of lanyards, safety grates and warnings. The manufacturer argued that the claim was preempted by the Safety Appliance Act. Id., at 897. The court found that the Act "does not subsume the entire field of devices which **could be** deemed safety equipment, but only the subject of those devices which **are listed** in the statute." Id., at 898 (emphasis added). The Act did not list lanyards or grates as enumerated devices, and the court found that "the plaintiffs' defect and negligence claims in this case are not preempted." Id. The Safety Appliance Act does not preempt state common law regulating railroad car equipment that is not listed in the Act.

*Finley, supra,* limits the Safety Appliance Act to the particular safety appliances enumerated in the Act; and Defendant has provided this Court with no reason that it should not follow its own authority in *Finley.* The *Garay* court reached the same conclusion in a preemption dispute, and the *Manser* court reached the same conclusion where a brake shoe manufacturer argued that the Act preempted state-law asbestos claims. Defendant cannot demonstrate that Plaintiffs' injuries arise from a defect in a device covered by the Act because brake shoes are not enumerated in the Act.

**X.      Now that Asbestos Is No Longer Used in the Railroad Industry, States Face New Risks Requiring Safety Equipment on Railroad Cars**

The Defendant's broad assumption that the Safety Appliance Act preempts all state law as to any "safety equipment" on a railroad car would leave a significant portion of the railroad industry unprotected by any law. (Doc. 33, page 5). Modern fleets of railroad cars are owned by the industries whose products are carried in the cars, and not necessarily by the railroads who are regulated by the FRA and whose employees are covered by the Federal Employers' Liability Act ("FELA"), 45 U.S.C.§ 51 *et seq.* This Court's decision will have less impact on the railroad industry's use of asbestos on the railroad cars, which ended long ago, and more impact on current operations that impose risk upon the railroad workers and the public.

For example, the most common hazardous material commodity transported by railroad cars today is denatured ethanol, of which hundreds of thousands of tank car shipments are made each year. (NTSB Accident Report, February 14, 2012, page 23). The shipments are carried in unpressuirzed tank cars, which are generally owned by industrial shippers, rather than the railroads. (e.g., see page 20). These shippers owe no duty to railroad workers under FELA, and their only duty to the railroad workers and others at risk of injury would be the duty imposed by state law. In its analysis of the safety performance of these cars, the National Transportation Safety Board ("NTSB") found a "high incidence of tank failures during accidents". (page 75). The NTSB found that the FRA regulations for safety equipment on these cars were inadequate; and the NTSB made numerous recommendations for safety equipment regulations (pages 111-113).

While the NTSB found that the FRA has not imposed sufficient safety standards on the owners and manufacturers of these cars, the Defendant would suggest that the states could impose no standards for their "safety equipment". Whether the manufacturers and owners of these tank cars, which have ruptured and exploded due to design defectives identified by the

NTSB, were negligent is beyond the scope of this brief.  However, acceptance of Defendant's proposition that the Safety Appliance Act preempts all state law regarding "safety equipment" would invalidate any state-law standard of care for "safety equipment" on railroad cars, resulting in there being no standard of care in cases such as the frequent explosions of tank cars carrying ethanol.  That example demonstrates that the Defendant is unjustified in suggesting that preemption of state law be extended to all "safety equipment" on railroad cars, when preemption under the Safety Appliance Act has only been extended to the specific devices required by the Act.

## XI.    The United State Supreme Court should abandon implied field preemption

The United States Supreme Court should abandon the doctrine of implied federal field preemption.[15]  *Napier* expressed the prevailing view of the Supreme court in the late 19th century and early 20th century that when Congress acted within its powers in enacting a statute, the states could no longer regulate within the field of that statute.  The Supreme Court held that any remedy for inadequate regulation must be addressed to the ICC, the federal agency that regulated the railroads in 1926.  *Napier,* Id. at 613.

Despite the broad language of *Napier*, until recently, the case was regarded by the Supreme Court as a conflict preemption case.  In the years following *Napier*, the states began to share responsibility for railroad regulation, with the acquiescence, if not the support, of the ICC. Although the repair and maintenance facilities of the railroads were instrumental in the safety of locomotives and rolling stock, the ICC never regulated them.  The various states did, however, exercise authority over those facilities.  By the time that the FRSA was enacted in 1970, many

---

[15] Plaintiff acknowledges that neither this Court nor the Pennsylvania Supreme Court can eliminate the doctrine of implied filed preemption, but she raises this issue to preserve it in the event further appeals are necessary.

state regulations regarding railroad safety were on the books.[16]

Petitioners in *Kurns* attempted to persuade the Third Circuit that it should analyze the statutes and regulations involved in this case using the two-fold analysis the Supreme Court adopted in *Wyeth v. Levine,* 555 U.S. 555 (2009), but the Third Circuit rejected Petitioners' suggestion in a footnote. This case ultimately presents the Supreme Court with the opportunity to prevent such error going forward by replacing implied federal field preemption with the express preemption the Supreme Court adopted in *Wyeth.*

In *Wyeth,* the Supreme Court held that federal courts should not presume that preemption was intended unless Congress clearly showed its desire to preempt:

> Our answer to that question must be guided by two cornerstones of our preemption jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); see *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct.219, 11 L.Ed.2d 179 (1963). Second, "[i]n **all** preemption cases, and particularly in those in which congress has 'legislated. . .in a field which the States have traditionally occupied,'. . .we 'start with the assumption that the historic police powers to the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Lohr,* 518 U.S., at 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (quoting, *Rice v. Santa Fe Elevator Corp.,* 331 U.A. 218, 230, 67 S.Ct. 1146, 91 L.Ed.1447 (1947)).

> 555 U.S. at 565 (emphasis added).[17]

Applying the *Wyeth* two-fold analysis to the instant case, the first question is whether Congress demonstrated an intent to preempt state product warning requirements in railroad shops. Such

---

[16] The view of Supreme Court regarding federal preemption had changed dramatically by the time the Federal Railway Safety Act was adopted. Compare *Napier v. Atlantic C. Ry. Co.,* 272 U.S. 605 (1926), with *Terminal R. Ass'n v. Trainmen,* 318 U.S. 1 (1943).

[17] The Third Circuit stated that *Wyeth* was a conflict preemption case, and therefore not controlling in a field preemption case. The Supreme Court has observed more than once that field preemption is but a species of conflict preemption. See *Glade v. National Solid Waste Management Ass'n,* 505 U.S. 88, 102 n.2 (1992); *English v. General Elec. Co.,* 496 U.S. 72, 75 n.5 (1990). *Wyeth* itself relied on several field preemption cases, including *Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996); *California v. ARC Am. Corp.,* 490 U.S. 93 (1989); and *Retail Clerks Int'l Ass'n v. Schermerhorn,* 375 U.S. 96 (1963).

intent must be viewed against the absence of regulations, as well as its joinder as *amicus* in support of the injured worker's family in *Kurns*. Assuming that there is no express statement of preemption in the statute, the second question is whether state law either conflicts with or thwarts congressional purpose, or whether state law makes it impossible for the manufacturers to comply with both federal railroad regulations and stat failure-to-warn products liability law. Id. at 1196-1200, 173 L.ED. at 62-66.[18]   In the Supreme Court we gave up the end filed preemption to enlist the government on our side.

In *Wyeth* the Supreme Court noted that Congress stated a clear intent to preempt state court law on product warning on vaccines[19] and tobacco[20]. Here, neither Congress nor the FRA asbestos dust generated when asbestos is placed on or removed from a locomotive is thus not an appurtenance.   Where defendant's product is not involved in any way with a locomotive obviously *Kurns* is inapplicable.  These factual issues require a jury.

*Napier* itself noted that if the states had a problem which they wished the federal government to allow them to address they had to go to the government for permission.  Here, the government has already stated its position that it does not preempt the failure to warn claim so *Napier's* requirements are met.  Further, the SAA cases clearly provide that the SAA provides the standards but stat law provides the remedy where as in *Myers* there is no specific standard set by the government the requirement of safety in the statute provides a basis for state law remedies for violation of SAA.

The cases above also suggested that violation of BIA/LIA statutory requirements of

---

[18] In an earlier non-railroad case, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 (1947), the Supreme Court emphasized that all federal preemption analysis should "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id. at 230.
[19] 42 U.S.C.§300aa-22(b)(1)(1987).

safety even if no federal standards were ever issued provide a basis for state law suits for remedies to carry out the federal standards.

For all these reasons none of the pending motions based on preemption should be granted.

Finally, *Napier* as limited to locomotives by the U.S. Supreme Court in *Terminal Railroad supra* when it explicitly held that there is no preemption under the BIA and/or SAA unless the government has acted to preempt.  Here the government has explicitly refused to preempt and agrees the case should proceed.

PAUL, REICH & MYERS, P.C.

BY: _Robert E. Paul_

Robert E. Paul

---

[20] 15 U.S.C.§1334(b)(2009).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYVLANIA
CIVIL SECTION:  TRIAL DIVISION

| | | |
|---|---|---|
| **ALICE AND GEORGE A. PERRY,** | § | **CIVIL DIVISION** |
| **Co-Administrators of the Estate of George** | § | |
| **Perry, and** | § | |
| **ALICE PERRY in her own right** | § | |
| | § | **NO. 95-CV-01996** |
| **v.** | § | |
| | § | |
| **A.W. CHESTERTON, et al.** | § | |

## ORDER

      **AND NOW,** to wit, this _____ day of _____, 2012, the motion of

**Railroad Friction Products Corporation** based on **Pre-Emption** is hereby **DENIED**.

                           By the Court,

                                   _____
                                            J.

## <u>CERTIFICATE OF SERVICE</u>

I, Robert E. Paul, Esquire, hereby certify that a true and correct copy of our Answer of Railroad Friction Products Motion based on Pre-Emption was served upon the following via e-mail on this 15th day of October, 2012.

_____
Robert E. Paul

Mark A. Lockett, Esquire
BONNER, KIERNAN, TREBACH & CROCIATA, LLP
Eight Penn Center, Suite 200
1628 John F. Kennedy Boulevard
Philadelphia, PA 19103
Phone: (215) 469-4433
Fax:    (215) 569-4434
mlockett@bktc.net
Counsel for Defendant

28

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

ALICE W. PERRY &amp;          :
GEORGE A. PERRY,           :
CO-ADMINISTRATORS OF       :
THE ESTATE OF GEORGE       :
PERRY, DECEASED, AND       :
WIDOW IN HER OWN RIGHT:
      Plaintiffs          :
                          :
     vs.                  :
                          :
A.W. CHESTERTON, INC.,:
et al                      :
     Defendants           :   NO. 95-CV-1996

- - -

Tuesday, February 23, 2010

- - -

Oral Deposition of EDDIE

VALENTINE, JR., taken at the Marriott

Waterside, 235 East Main Street, Norfolk,

Virginia commencing at 11:15 a.m., before

Janice L. Welsh, Court Reporter and Notary

Public; in and for the Commonwealth of

Pennsylvania.

* * *

VERITEXT NATIONAL COURT REPORTING COMPANY
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, Pennsylvania 19103

Page 26

EDDIE VALENTINE, JR.

1
2  A.  No.  That's all over the railroad.  It
3  comes in up there around 58th Street, and all
4  the way down to the docks and everything.  You
5  go all over.  You carry everything.  The man
6  tells you, and you say okay.  He says carry
7  this box of mail or carry this -- if you got
8  typewriter paper.
9  Q.  Was there a particular name for this
10  rail yard, a nickname, or name that it went
11  by?
12         MR. PRESENT:  Which rail
13  yard?
14         MR. LOCKETT:  The rail yard
15  he worked for C&O.
16         THE WITNESS:  They called
17  it different names.  You got 23rd, 12, you got
18  34th Street, you got Pier 4.  Now it's A, B
19  and C.  And you got the coal yard.  Everything
20  down there belong to C&O you carry mail for,
21  in the offices, and out on the docks, and up
22  the track.  Anywhere there is people that you
23  got to carry the mail to, that's what you do.
24  BY MR. LOCKETT:
25  Q.  You worked as a clerk.  What did you do

Page 27

EDDIE VALENTINE, JR.

1
2  as a clerk?
3  A.  I checked freight down the waterfront.
4  Q.  As a forklift driver was that on a pier?
5  A.  Yes.  From the five thousand pound to
6  ninety thousand pound motors.  The big ones.
7  I would drive them all.
8  Q.  Are there any other jobs you performed
9  that we haven't talked about while you were at
10  C&O?
11         MR. PRESENT:  So far you
12  mentioned laborer, mailman, operator, driving
13  trucks, forklifts, cranes, and a clerk.  Those
14  are the five jobs you have talked about.
15         THE WITNESS:  We worked
16  with railroad cars and stuff like that.  You
17  go and get the packages and stuff like that.
18  During that time they were bringing people
19  in.
20         MR. PRESENT:  Passenger
21  cars?
22         THE WITNESS:  Yeah.  We did
23  that too.
24  BY MR. LOCKETT:
25  Q.  What position did you work there?

Page 28

EDDIE VALENTINE, JR.

1
2  A.  We separated mail, and then we got the
3  people's clothes off, the baggage and luggage,
4  and stuff like that.
5         MR. PRESENT:  Off the
6  record.
7              - - -
8              (Whereupon a discussion was
9  held off the record.)
10  BY MR. LOCKETT:
11  Q.  Mr. Valentine, I want to reconfirm the
12  years you worked for C&O.  Was it 1957 to
13  1971?
14  A.  Yes.  I can't remember exactly.  I
15  didn't go back when they laid me off.  I was
16  working somewhere else and I just didn't go
17  back.  They called for me.
18  Q.  You ended your work relationship with
19  C&O in 1971.  You didn't go back after that,
20  is that correct?
21  A.  Yeah.
22  Q.  Did you know George Perry?
23  A.  Yeah.  We used to swing together.
24  Q.  You used to what?
25  A.  I know him better in the street.  You

Page 29

EDDIE VALENTINE, JR.

1
2  know what I mean?
3  Q.  No.  I don't.  Could you explain what
4  you mean?
5  A.  He was an older guy.  We would go to a
6  club, or be in the street talking, or with the
7  boys playing.  I know him that way.
8  Q.  Did he live by you?
9  A.  I don't know where he lived at.  Mostly
10  in the street is where I met him at and on the
11  job.
12  Q.  You said he was an older guy?
13  A.  He wasn't that much older.  About two or
14  three years older.  Three or four.  I can't
15  remember.  Not that much older.
16  Q.  Can I ask you describe what he looked
17  like?
18  A.  He was about his size but a little
19  taller.  He was about 5'10 or 5'11.
20  Q.  Caucasian or African American?
21  A.  African American.  He's darker than me.
22  He's a little darker than me.
23         MR. PRESENT:  I have a
24  picture if you want to see it.
25  BY MR. LOCKETT:

Page 30

EDDIE VALENTINE, JR.

1
2  Q.  Where did you work with George Perry at?
3  A.  I seen him on the job. He worked at the
4  barney yard. I would come down there and I
5  see him riding. I never worked with him. I
6  seen him riding the cars. And I would see him
7  up and down the tracks. I don't know whether
8  I gave him mail personally or not, but I know
9  him. I know him personally from the street,
10  and you see him on the job, and you say how
11  you doing.
12  Q.  You would pass him during the course of
13  the day?
14  A.  Sometimes. Not every day because I
15  don't work his shift or nothing, but when I
16  see him I know him.
17  Q.  Did you work with him in performing any
18  work or job functions at the railroad?
19  A.  No. I never worked with him. He was a
20  rider. He did brake cars when they come down
21  the track. He stopped them from rolling in
22  the river. They have to go over scales and
23  they got to be a certain weight.
24  Q.  When you say you saw him riding cars,
25  what do you mean by that?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 31

EDDIE VALENTINE, JR.

1
2  A.  The cars got to be weighed before they
3  go on the ship. They bring a string of cars
4  in.
5  Q.  What kind of cars?
6  A.  Coal cars. You got to go up on top and
7  put the brakes tight on that second car, and
8  then you come down and take the brake off the
9  first car. You know, break it loose. You
10  have some guys down there with teasers.
11  Sometimes you don't get a chance to get back
12  down there and they yell catch it and brake
13  it. So, you brake it down in the area where
14  they can go across the scale at a certain
15  speed and stuff. Sometimes they get away and
16  sometimes they don't. It's nasty down there.
17  Let's put it that way. There's cars bumping
18  and every time a car bumps you got brake, coal
19  dust, everything come out.
20  Q.  When you saw him riding in the coal car
21  where was it at the rail yard? What part of
22  the rail yard was that at?
23  A.  He was going down to the hopper. He
24  would bring the car down to be weighed so it
25  can go on the ship. It's got a big hopper,

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 32

EDDIE VALENTINE, JR.

1
2  and you dump it in the hopper, and roll it
3  down the belt and roll it on the ship.
4  Q.  How often would you see him do that?
5  A.  If I'm around. They don't do it very
6  often. Every 15 or 20 minutes. You know, how
7  many people be out there doing it. Sometimes
8  every 30 minutes and sometimes 15 minutes.
9  Sometimes they had to walk up and down the
10  tracks with it and everything else.
11  Q.  Was Mr. Perry with the railroad during
12  the entire time you were there?
13  A.  I couldn't tell you that, no. I know he
14  was down there and he was working. We would
15  be out there and I would see him all the
16  time.
17  MR. PRESENT:  I think what
18  he means is during your career while you were
19  employed by C&O was he also employed by C&O
20  for that entire time?
21  THE WITNESS:  I guess so,
22  yeah. I seen him. I can't put --
23  MR. PRESENT:  He was
24  working for them?
25  THE WITNESS:  Yeah.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 33

EDDIE VALENTINE, JR.

1
2  MR. PRESENT:  That's what
3  you meant, right?
4  THE WITNESS:  Yeah.
5  MR. LOCKETT:  You're
6  clairvoyant.
7  THE WITNESS:  Yeah. I
8  thought he was still working down there. As
9  far as I know I thought he was still working
10  done there, but he done pass.
11  BY MR. LOCKETT:
12  Q.  When is the last time you saw Mr. Perry?
13  A.  Don't ask me that.
14  Q.  Did you see him at all after you left
15  the railroad in 1971?
16  MR. PRESENT:  Like on the
17  street and stuff?
18  THE WITNESS:  I guess I
19  did. I had a whole lot of friends. I was
20  raised right down there on the waterfront ever
21  since I was about five years old. My mother
22  carried food down there to the dock workers.
23  BY MR. LOCKETT:
24  Q.  Mr. Valentine, my question is did you
25  see Mr. Perry at all after you left the

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 34

EDDIE VALENTINE, JR.

1         EDDIE VALENTINE, JR.
2 railroad?
3   A.   Yeah. I seen all of them after I left
4 the railroad, but I can't put a time on it
5 what time I seen them. I see them uptown and
6 stuff like that. I can't say I seen him in
7 '71. I have been away from working 23 years
8 now. I can't say that now.
9   Q.   During the time that you worked at the
10 railroad for C&O did you ever observe Mr.
11 George Perry work with or near any
12 asbestos-containing products?
13   A.   Yeah. Everybody that worked there that
14 was out on the ground working was in asbestos.
15   Q.   My question is with respect to Mr.
16 George Perry did you ever observe him working
17 with or near any asbestos-containing products?
18   A.   Yeah. He was right by asbestos all the
19 time working around them cars. He ran them
20 brake pads. All of them was asbestos. I
21 don't know whether all of them was asbestos or
22 not, but most of them I know was asbestos.
23 Like Bendix brakes and stuff like that. I
24 remember Bendix. I know a few other names.
25 They also had --

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 35

EDDIE VALENTINE, JR.

1         EDDIE VALENTINE, JR.
2   Q.   How did you know --
3       MR. PRESENT: Let him
4 finish. Do you think it will help to look at
5 this?
6       MR. LOCKETT: He'll look at
7 that afterwards.
8       MR. PRESENT: We'll do it
9 your way.
10 BY MR. LOCKETT:
11   Q.   When you say asbestos brakes, what do
12 you mean by asbestos brakes?
13   A.   The brake pad that rubs up against the
14 thing is asbestos. Everybody know that.
15 After they found out what it was they know it
16 was asbestos.
17   Q.   Where were the asbestos brakes that you
18 saw when you were working with Mr. Perry or
19 when you saw Mr. Perry on the job?
20   A.   All the railcars. Let me get you all
21 straight about something. They got to drag
22 all them brakes unless them cars would run
23 away. They got to drag all them cars. Every
24 one of them got a drag on them.
25   Q.   How did you know the brakes on the

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 36

EDDIE VALENTINE, JR.

1         EDDIE VALENTINE, JR.
2 railcars contained asbestos?
3       MR. PRESENT: He wants to
4 know how you knew that.
5       THE WITNESS: Everybody
6 know that. The guy would be talking about,
7 man, did you know that was asbestos we was
8 working with. That's how I found out about
9 it.
10 BY MR. LOCKETT:
11   Q.   Somebody told you that the brakes
12 contained asbestos?
13   A.   Yeah. All over the waterfront know it
14 afterwards.
15   Q.   Who told you that the brakes on the
16 railcars contained asbestos?
17   A.   A whole lot of guys that's dead. Willie
18 Pigrum and all them guys that work ahead of me
19 there are dead now.
20   Q.   Co-workers told you?
21   A.   Yeah.
22       MR. PRESENT: That's
23 P-I-G-R-U-M.
24       THE WITNESS: I guess
25 that's how. And Eugene Myers. He just died

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 37

EDDIE VALENTINE, JR.

1         EDDIE VALENTINE, JR.
2 this year.
3 BY MR. LOCKETT:
4   Q.   Mr. Valentine, do you remember any other
5 types of asbestos products that you saw Mr.
6 George Perry work with or near at the rail
7 yard?
8   A.   Those shanties that they lived in, put
9 their clothes in and stuff was made of GP.
10 That was asbestos board. Like you use sheet
11 rock and stuff like that, that was asbestos
12 board.
13   Q.   Where was that at?
14   A.   That was down the piers. All the piers
15 was like that. Then they tore them all down
16 after they found out what it was.
17   Q.   Where was the board on the pier?
18   A.   Up and down the tracks. They had little
19 shanties for them to stay in to get out of the
20 cold and stuff like that. They tore all that
21 stuff down once they found out what it was.
22   Q.   What was the asbestos board used for on
23 the pier?
24   A.   To build the shacks. They were living
25 in this stuff. They built the shacks where

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 38

EDDIE VALENTINE, JR.

1
2  they stay in and eat.
3  Q.   So, the shacks where workers ate in had
4  asbestos board?
5  A.   Yeah.
6  Q.   How do you know that, sir?
7  A.   I looked at it after I found out what it
8  was. It got GP written on it and all kinds of
9  stuff. That's all asbestos.
10  Q.   You say GP?
11  A.   It was the name of a company. I can't
12  think of some of the other names now. If I
13  looked through that thing I probably can tell
14  you the names. There's A.W. there. I know I
15  seen that, but I can't put directly where I
16  seen it at. Some of them companies there.
17  Q.   Did you ever see Mr. Perry in the shacks
18  that you described?
19  A.   Yeah. Everybody would be in them when
20  it's cold. It wasn't one brakeman. You got a
21  shift of about two or three guys riding and a
22  couple of guys stayed down to tease them. You
23  know, tease it off to get it going. You
24  couldn't hardly move them if you don't take
25  the brake all the way off because they got a

Page 39

EDDIE VALENTINE, JR.

1
2  drag on them. You got to keep a drag on
3  them. If your train is sitting out there the
4  wind could push it down the track.
5  Q.   Do you recall the names of any other
6  types of asbestos products you saw Mr. Perry
7  work with or near while you were at the rail
8  yard?
9  A.   I didn't see him work with it. I seen
10  him work around it.
11  Q.   Any other products you saw him work
12  around?
13       MR. PRESENT: So far you
14  said brakes and boards.
15       THE WITNESS: That's about
16  all. All I can say is dust. It's a nasty job
17  when the wind get up.
18  BY MR. LOCKETT:
19  Q.   My question, Mr. Valentine, is what
20  other types of products you saw him work
21  near.
22  A.   I don't know whether he worked with it
23  or what, but I do know things. I say the
24  different types of brakes that you see
25  sometimes, and the type of board, and moving

Page 40

EDDIE VALENTINE, JR.

1
2  supply stuff and everything that we used to
3  move around that was asbestos, but he didn't
4  work down there. He worked up here with the
5  coal.
6  Q.   I want to know what types of products
7  you saw Mr. Perry work with or around.
8  A.   Nothing but that gypsum -- that board
9  and brakes. That's the only thing I could see
10  where asbestos would get to him at.
11       MR. PRESENT: Brakes and
12  board.
13       THE WITNESS: That's all.
14  He wasn't down there where everything was
15  loose at. He was up there.
16  BY MR. LOCKETT:
17  Q.   Are you able to identify with respect to
18  the brakes the names of any manufacturers of
19  the brakes?
20  A.   I can remember Bendix. I can remember
21  that outright. I could look at some of the
22  names and tell you whether --
23  Q.   We'll get to that.
24       MR. PRESENT: For the
25  record he is pointing down to Exhibit-1, the

Page 41

EDDIE VALENTINE, JR.

1
2  exhibit that was previously marked, which is
3  signed by Mr. Valentine.
4  BY MR. LOCKETT:
5  Q.   Mr. Valentine, how do you know they were
6  Bendix brakes that you saw Mr. Perry work
7  near?
8  A.   I said I seen Bendix brakes down at the
9  shop and everything they were using to work on
10  those brakes. I wasn't down there like that.
11  Q.   What do you mean a shop?
12  A.   They had a shop to fix the brakes up on
13  34th Street. I think the shop is up a little
14  bit further because they move stuff around.
15  They go in there and put the brakes on them
16  cars and everything. They don't work on them
17  cars or nothing down there when they're
18  unloading and loading them.
19  Q.   Did you ever observe Mr. Perry present
20  when brakes were being removed or replaced?
21  A.   No. He might have been down there. I
22  never seen him.
23  Q.   When you saw Mr. Perry near these brakes
24  around the railcars, what was he doing?
25  A.   What was he doing to the brake?

Page 42

EDDIE VALENTINE, JR.

1
2  Q.  What was he doing?  What did you see him
3  doing when you saw Mr. Perry near or around
4  the asbestos brakes on the railcars?
5  A.  He wasn't doing nothing but walking
6  beside them.  He do his work up top.  He was
7  walking beside the brakes.  They was engaged.
8  He was walking with it.  There's a drag on it
9  and you either got to take it off or tighten
10  it up to stop it.  That's what it is.
11  Q.  When he was either taking the brake off
12  or tightening it, where was he at that time?
13  Was he on the railcar itself?
14  A.  Yeah.  He was up on top of the railcar.
15  Q.  When you saw him on the railcar either
16  putting the brake on or taking it off, do you
17  know who the manufacturer was of the brake on
18  the car?
19  A.  No.  I don't know.  I have nothing to do
20  with it.
21  Q.  Other than when you saw Mr. Perry on top
22  of the car applying or disengaging the brake,
23  did you ever see him around what you believe
24  would be asbestos brakes any other time?
25  A.  I don't know what kind of brakes are

Page 43

EDDIE VALENTINE, JR.

1
2  there, but I know it was asbestos on them
3  cars.  I can't go there and say which one got
4  this and which one got that.  All I know is I
5  seen certain types of stuff at the job.
6  That's all I see.  I'm not walking up and down
7  with him and looking at the brakes.  You know
8  what I mean?  Because it's dusty.  I seen him
9  riding the cars.  They love to wave when
10  they're on top of the cars.
11       Then you go to the shack and
12  he's in those places.  I have been around a
13  lot of them shacks that wasn't safe for humans
14  to be in.  It was a thing of life.  People
15  think it's a joke.  It was a thing of life.
16  I'm lucky.  I still can breathe.  Most of the
17  guys I know are gone.  I ain't kidding you.  I
18  got a cousin right now in and out of the
19  hospital.  His name is Benny Baskerville.
20  He's in bad shape.  He's younger than I am.
21       MR. PRESENT:  That's short
22  for Benjamin?
23       THE WITNESS:  Yeah.  His
24  name was Benny Baskerville.
25       MR. PRESENT:

Page 44

EDDIE VALENTINE, JR.

1
2  B-A-S-K-E-R-V-I-L-L-E.
3       THE WITNESS:  Yeah.  He's
4  in bad shape.
5  BY MR. LOCKETT:
6  Q.  Mr. Valentine, any other products, other
7  than what you have described, that you saw Mr.
8  Perry work near while he was at the rail yard?
9  A.  That could have did him harm?
10  Q.  No.  That contained asbestos.
11       MR. PRESENT:  Any other
12  asbestos besides the brakes and boards?
13  Anything else?
14       THE WITNESS:  No.  I can't
15  say nothing else.
16       MR. LOCKETT:  Off the
17  record.
18          - - -
19       (Whereupon a discussion was
20  held off the record.)
21          - - -
22  BY MR. LOCKETT:
23  Q.  Mr. Valentine, you have a copy of what
24  has been marked Exhibit-1 in front of you.
25  You have seen this complaint before today?

Page 45

EDDIE VALENTINE, JR.

1
2  A.  I think so.
3  Q.  The first page, is that your signature
4  up at the top?
5  A.  Yes.
6  Q.  Was this given to you by Mr. Present?
7  A.  Yes, uh-huh.
8  Q.  What were you asked to do with it?
9  A.  Pick out any of the names that I seen on
10  the waterfront, and what it bring to my mind
11  what it was.  You know what I mean?  I just
12  picked out some of them that I have seen down
13  there.
14  Q.  Did you put an "X" next to them?
15  A.  Yeah.
16  Q.  Let's go through this page by page, Mr.
17  Valentine.  On the first page where your
18  signature is at the top if you go down the
19  list there are "X's" placed next to none of
20  the names; is that correct?
21  A.  No.
22  Q.  There are no "X's"?
23  A.  No.
24  Q.  If you go to the second page there is
25  one "X" next to CSX Transportation, Inc.  Why

Page 54

EDDIE VALENTINE, JR.

1  stuff like that.
2
3  Q.   Mr. Valentine, these Mobil Oil boards
4  you made reference to, do you associate them
5  with any asbestos-containing products that you
6  ever observed Mr. George Perry work with or
7  near?
8  A.   No. He wasn't no where near it. He
9  works in a different department. He never
10  leave that job. He don't leave that lot. I
11  never seen him work down the coal fields. I
12  never seen him work in shops and places like
13  that. When I go down there, there's three
14  piers, and I would be looking for my boys, and
15  they will be up in the track and in the
16  sheds. That's the only way I see them. And
17  uptown.
18  Q.   Uptown you mean outside of work?
19  A.   Yeah. The reason I haven't seen them in
20  a long time is because I moved from where I
21  used to live at. So, I don't be in the
22  neighborhood.
23  Q.   The next name you checked off was
24  Owens-Corning Fiberglas Corporation. Do you
25  know why you put a mark next to

Page 55

EDDIE VALENTINE, JR.

1
2  A.   I think it was on some of the same stuff
3  that -- you know, on the boards, and plaster,
4  and powder stuff. Something that we handled.
5  I can't say completely.
6  Q.   Do you associate that with an
7  asbestos-containing product?
8  A.   Yeah.
9  Q.   What product is that?
10  A.   All three of them.
11  Q.   What do you mean by all three of them?
12  A.   Mobil, Owens-Corning and Illinois.
13       MR. PRESENT: They're the
14  only ones he asked you about so far.
15       THE WITNESS: Okay.
16  BY MR. LOCKETT:
17  Q.   Is the Owens-Illinois product a product
18  that you ever saw Mr. George Perry work with
19  or near at the rail yard?
20  A.   No.
21  Q.   The next one you have checked off is
22  Railroad Friction Products Corporation. Why
23  did you put an "X" next to that name?
24  A.   I seen it up -- in would be up in the
25  yard. Some of them don't be open.

Page 55

EDDIE VALENTINE, JR.

1
2  Owens-Corning?
3       MR. PRESENT: It's right
4  there. That was one of the other ones you
5  checked off.
6       THE WITNESS: We handled
7  some of that stuff. It was in packages,
8  Owens-Corning.
9  BY MR. LOCKETT:
10  Q.   What kind of stuff?
11       MR. PRESENT: Freight?
12       THE WITNESS: Yeah,
13  freight. I said we handled it. He didn't
14  handle any of it that I know of.
15  BY MR. LOCKETT:
16  Q.   What kind of product is it?
17  A.   It's patch. It's in a powder form.
18  Some was in a powder form and some was in
19  buckets in this paste like.
20  Q.   This is not a product you ever saw Mr.
21  Perry work with or near?
22  A.   No. I never seen that.
23  Q.   The next one you have marked off is
24  Owens-Illinois, Inc. Why did you check that
25  name?

Page 57

EDDIE VALENTINE, JR.

1
2  Q.   What type of product?
3  A.   Brake pads and something else. I can't
4  think of what it was.
5  Q.   Where did you see Railroad Friction
6  Products brakes at the yard?
7  A.   Up at the yard where they fixed the cars
8  and brakes and things. They got two or three
9  different shops up there. I don't know
10  whether I seen some of it in the warehouse or
11  not. They got a little warehouse where they
12  got stuff.
13  Q.   Where did you see them at the shop or in
14  the yard, outside or inside?
15  A.   Outside. All this stuff outdoors.
16  Q.   How did you know they were Railroad
17  Friction Products brakes?
18  A.   You seen some of the brakes in the empty
19  crates. You know what you mean? They would
20  be out there in the empty crates. Like I say,
21  it could have been another brand in the empty
22  crates. If you see two or three crates up
23  there like that, and they putting stuff in
24  one, you know what I mean, you're going to
25  think it's the same thing. I did not get down

## Page 58

EDDIE VALENTINE, JR.
1
2 to look at it. It's brakes laying down
3 there. I just going about my business. I
4 just seen the name on it.
5    Q.   Do you know whose brakes they were that
6 you saw?
7    A.   Yeah. They were railroad brakes.
8    Q.   What do you mean they were railroad
9 brakes?
10    A.   They belong to the shop. You know, the
11 railroad shop.
12    Q.   When you say they were railroad brakes,
13 they were railroad brakes for railcars. Is
14 that what you're saying?
15    A.   Yes.
16    Q.   Did you ever see any Railroad Friction
17 Products brakes?
18         MR. PRESENT: He just said
19 that.
20         MR. LOCKETT: No, he said
21 railroad brakes.
22         THE WITNESS: Yeah, I seen
23 the product.
24 BY MR. LOCKETT:
25    Q.   How did you know they were from Railroad

## Page 59

EDDIE VALENTINE, JR.
1
2 Friction Products Corporation?
3    A.   They were in the John Brown box. I said
4 John Brown box. I mean they were laying in
5 the box. Just like you come up you see a four
6 pack of this. You see some more boxes that
7 don't have anything in it, you think it's an
8 exchange.
9    Q.   My question is how did you know they
10 were Railroad Friction Products brakes?
11         MR. PRESENT: Objection,
12 asked and answered. You can answer again.
13         THE WITNESS: I don't know
14 that. I said they were laying in a Railroad
15 Friction box.
16 BY MR. LOCKETT:
17    Q.   They were in a Railroad Friction box?
18    A.   Yeah.
19         MR. PRESENT: That's what
20 he said.
21         THE WITNESS: One or two
22 full boxes might be sitting up there. Any
23 time they're exchanging product you got a
24 place where they put the other ones at. So,
25 they're somebody's brakes, but I don't know

## Page 60

EDDIE VALENTINE, JR.
1
2 who they is. I didn't look at the brake.
3 BY MR. LOCKETT:
4    Q.   What did the brakes look like that you
5 saw in the box?
6    A.   They looked like railroad brakes but it
7 looked like they had been worn. You know,
8 they were about half the size of an ordinary
9 brake.
10    Q.   What color were they?
11    A.   I'm colorblind, but it looked like that
12 color right there.
13         MR. PRESENT: The reddish
14 color?
15         MR. LOCKETT: Objection.
16         THE WITNESS: They look
17 about like that. You know what I mean?
18         MR. PRESENT: He's pointing
19 to the chair, and the chair is like a reddish
20 or maroon.
21         THE WITNESS: Yeah.
22 Something like that. I'm colorblind.
23 BY MR. LOCKETT:
24    Q.   Can you describe the box in which you
25 saw these brakes?

## Page 61

EDDIE VALENTINE, JR.
1
2    A.   I said the box is about as tall as this
3 right here and no longer than that like.
4         MR. PRESENT: Indicating
5 three feet for the record.
6         THE WITNESS: Yeah, about
7 that size.
8         MR. PRESENT: Indicating
9 another three feet for the record.
10         THE WITNESS: It's just big
11 enough to put them brakes in and take brakes
12 out.
13 BY MR. LOCKETT:
14    Q.   Was there any writing on the box?
15    A.   That's what I said it was. Each one you
16 might see said Owens-Corning, or it might be
17 from -- what is this other one called? W.R.
18 Grace had boxes up there, and stuff like
19 that. Then some of the boxes were inside.
20 That Owens-Corning, they make all types of
21 asbestos.
22    Q.   I'm talking now about Railroad Friction
23 Products.
24    A.   Railroad Friction Products most of the
25 time was brake or some other kind of stuff

## Page 62

EDDIE VALENTINE, JR.

that would be in the boxes, but it would be
Railroad Friction boxes.

Q.   Where was the writing on the box?

A.   On the crates. You know, the thing in
between them like that. Sometimes there's a
gap in the thing like that. It got boards on
it.

Q.   So, the boxes were made out of what?

A.   Wood. It's made out of wood. Sometimes
real thin wood, but it got wire in between
them.

Q.   What color was the writing on the box?

A.   Dark. It might be black, might be
brown. I'm colorblind about stuff like that.
Anything dark. Like over there it look like
he's got two colors, but it look the same.

MR. PRESENT: You mean the
man there?

THE WITNESS: Yeah. You
know, his pants and his coat.

BY MR. LOCKETT:

Q.   Did you ever observe Mr. George Perry
work with or near Railroad Friction Products
brakes?

## Page 63

EDDIE VALENTINE, JR.

MR. PRESENT: He wants to
know if George Perry ever worked near the
Railroad Friction Products brakes as far as
you know.

THE WITNESS: The only
thing I know he worked near the train. He was
right up on the train walking up and down the
steps. As far as I know he could have any
kind of brake. I don't know that.

BY MR. LOCKETT:

Q.   So, when you saw him traveling on the
car, you don't know whose brake was on the
car?

A.   No. You don't know. Not out there.
But like you go down to the shop and --
somebody asks you go find out, I would down
the shop, and that's where I seen some stuff
at.

Q.   My question is very simple. When you
saw him riding on the coal car, you didn't
know whose brake was on the coal car?

A.   No. All I know is he got railroad
brakes on that car. That's all I know. Then
you got foreign cars come in there.

## Page 64

EDDIE VALENTINE, JR.

Q.   When you saw him riding on the car, you
didn't know if they were Railroad Friction
Products brakes or someone else's brakes?

MR. PRESENT: Objection.

THE WITNESS: No, you
actually don't know. Can I ask you a
question?

MR. PRESENT: He might not
answer, but you can ask him.

MR. LOCKETT: You don't
need to ask me a question.

MR. PRESENT: I would love
to ask him a bunch of questions, but it
doesn't work that way. He asks and you
answer. That is never going to change as long
as I'm a lawyer.

THE WITNESS: It's
confusing.

MR. PRESENT: If you write
it down I'll ask him the question privately
and maybe he'll tell me.

BY MR. LOCKETT:

Q.   Mr. Valentine, just so I'm clear --

MR. PRESENT: Objection.

## Page 65

EDDIE VALENTINE, JR.

You have asked this five times.

MR. LOCKETT: Well, I'm
going to ask it one more time until I
understand his answer.

BY MR. LOCKETT:

Q.   On those occasions when you observed Mr.
George Perry riding on the railcars, you don't
know whose brake was on the railcar he was
riding on?

MR. PRESENT: Objection,
asked and answered.

BY MR. LOCKETT:

Q.   Correct?

A.   That's right. I don't know.

MR. PRESENT: Objection.

BY MR. LOCKETT:

Q.   Moving to the next page. I guess we're
on page five. The next name I see that you
have an "X" next to is Uniroyal, Inc. Why did
you check Uniroyal?

A.   Uniroyal has a paste and powder that you
mix like for your plaster. You know, made up
that plaster stuff. I know it was paste and
powder.

EDDIE VALENTINE, JR.

1
2  Q.   Do you know whether this product
3  contained asbestos?
4  A.   No.
5  Q.   Do you associate the Uniroyal paste or
6  powder with any asbestos-containing product
7  that you ever saw Mr. George Perry work with
8  or near at the rail yard?
9  A.   No.
10  Q.   The last one that I see that you have
11  marked is W.R. Grace.
12  A.   Um-hum.
13  Q.   Why did you pick that?
14  A.   That's a product like that board. I
15  think they had some board.
16  Q.   Board?
17  A.   Yeah. And had plaster and that paste.
18  Q.   Were any of these asbestos products?
19  A.   Well, like I said, where I seen them at
20  it was contaminated. See, I worked other
21  places before. The railroad ain't the only
22  place I worked where I seen them where it was
23  contaminated.
24  Q.   Did you ever see Mr. George Perry work
25  near or with any W.R. Grace products that

EDDIE VALENTINE, JR.

1
2  contained asbestos at the rail yard?
3  A.   No.
4       MR. LOCKETT: I think I'm
5  done. I'll pass him on for now.
6       MR. PRESENT: I'm going to
7  limit my questions to that one company that
8  you represent, if that's okay.
9
10       EXAMINATION
11       - - -
12  BY MR. PRESENT:
13  Q.   Mr. Valentine, I'm going to confine my
14  questions now to one product and one issue.
15  Just so Janice can follow along I'm going to
16  move into this seat and I'll sit here.
17       Mr. Valentine, Railroad
18  Friction Products Corp is one of the companies
19  you checked off. You said they made brakes.
20  You saw the boxes. Do you remember that
21  testimony?
22  A.   Um-hum.
23  Q.   When you were in the shop where they
24  were doing the repairs, wherever it was, I
25  guess it was Bourbon & White.

EDDIE VALENTINE, JR.

1
2  A.   Um-hum.
3  Q.   Did you actually see men that would take
4  the brakes out of the boxes and put them on
5  cars from time to time while you were
6  working? I'm not talking about Perry. Did
7  you see them?
8       MR. LOCKETT: Objection,
9  leading, mischaracterizes the testimony.
10       THE WITNESS: I have never
11  been right up on them to see what they were
12  doing, but I seen them with the brakes over
13  there. They would be away from me by that
14  wall. The boxes would be there and they would
15  be doing something.
16  BY MR. PRESENT:
17  Q.   So, they were working doing something,
18  but you couldn't tell exactly what they were
19  doing?
20  A.   No.
21  Q.   But they had them boxes there?
22  A.   Yeah. They had boxes.
23  Q.   When they were doing that work from a
24  distance which is about 30 or 40 feet from you
25

EDDIE VALENTINE, JR.

1
2       MR. LOCKETT: Objection to
3  form, leading.
4  BY MR. PRESENT:
5  Q.   -- as far as you could tell were they
6  putting brakes on all kinds of cars, hoppers,
7  engines, coal cars?
8       MR. LOCKETT: Objection to
9  form, leading.
10       THE WITNESS: Most of the
11  time they were working on cars that the brakes
12  are worn all the way down, and sometimes they
13  lock up and have the wheel dragging.
14  BY MR. PRESENT:
15  Q.   I have that problem with my briefcase.
16       So, included in that process,
17  these men that were working at Bourbon &
18  White, would they be putting brakes on coal
19  cars too as far as you could see?
20  A.   Yeah.
21       MR. LOCKETT: Objection,
22  leading.
23  BY MR. PRESENT:
24  Q.   After they were fixed up -- after the
25  coal cars were repaired, the brakes were fixed

Page 70

EDDIE VALENTINE, JR.

1
2  up, would they go back in service for the C&O
3  to carry stuff?
4  A.   I can't say to carry stuff. All I know
5  they going away from there. They're getting
6  ready to ship them out.
7  Q.   So, they're going to put them back in
8  service?
9  A.   Yeah.
10  Q.   If they would ship a car out with a load
11  of something, or to pick up something, it
12  would generally come back to Norfolk, wouldn't
13  it?
14        MR. LOCKETT: Objection,
15  leading.
16  BY MR. PRESENT:
17  Q.   A car they fixed.
18        MR. LOCKETT: Assumes facts
19  not in evidence.
20  BY MR. PRESENT:
21  Q.   If a car got fixed at Bourbon & White
22  and got sent out by the C&O, would it at some
23  point come back to Norfolk?
24        MR. LOCKETT: Objection,
25  leading.

Page 71

EDDIE VALENTINE, JR.

1
2        THE WITNESS: Sometimes it
3  come back. They're on that car.
4        MR. LOCKETT: Assumes facts
5  not in evidence.
6  BY MR. PRESENT:
7  Q.   They had other facilities besides
8  Norfolk, right?
9  A.   The C&O?
10  Q.   Yeah.
11  A.   Yeah.
12  Q.   But was Norfolk, as far as you know, or
13  Newport News where this was, was that their
14  only terminal at the ocean?  Is that where
15  they would load ships to the ocean?
16  A.   They loaded on the docks most of the
17  time. Now you got warehouses. The freight
18  don't reach certain places and they put it in
19  the warehouses and move them around. It's
20  moved by train now.
21  Q.   Generally when they would bring stuff to
22  Norfolk, like the coal and stuff, the purpose
23  was to unload it and put it on the ship to
24  take somewhere else, right?
25  A.   Yeah.

Page 72

EDDIE VALENTINE, JR.

1
2  Q.   So, generally if a coal car went out to
3  get coal, it would come back to your spot from
4  time to time?
5  A.   Yeah.
6        MR. LOCKETT: Objection,
7  lack of foundation, leading.
8        THE WITNESS: Yeah. They
9  unload them cars and ship them right back to
10  West Virginia.
11  BY MR. PRESENT:
12  Q.   And bring it back?
13  A.   Yeah.
14  Q.   Now, when that would happen then -- are
15  you convinced that at some point during your
16  time there over the years that George Perry
17  would be riding on and stopping and braking a
18  coal car that had been repaired in your shop?
19  A.   Yeah.
20        MR. LOCKETT: Objection,
21  BY MR. PRESENT:
22  Q.   Would that include the new brake work?
23        MR. LOCKETT: Objection,
24  lack of foundation.
25        THE WITNESS: Yeah. I want

Page 73

EDDIE VALENTINE, JR.

1
2  to explain something to you. You got brake
3  cars all the way to West Virginia. Everywhere
4  that train is going you got people putting
5  cars on them because a brake would lock up.
6  The tire won't move. You got to have somebody
7  break it up. If it's up in West Pointe they
8  fix it up there, if it's up in West Virginia
9  they fix it there, if it breaks down here they
10  fix it down here.
11  BY MR. PRESENT:
12  Q.   But those coal cars would generally come
13  back and Mr. Perry would be riding on them?
14        MR. LOCKETT: Objection.
15        THE WITNESS: They don't
16  probably change them. When they unload them
17  they took them right back to those mines.
18        MR. LOCKETT: Objection,
19  lack of foundation.
20  BY MR. PRESENT:
21  Q.   So, are you convinced then from what you
22  saw in terms of the repair work on there, and
23  the fact that them coal cars came back to the
24  barney yard, that the Railroad Friction brakes
25  that they had put on at Bourbon & White, your

Page 74

EDDIE VALENTINE, JR.
1
2    repair facility, were still on them cars from
3    time to time when they came back to the barney
4    yard and George Perry was working on them?
5         MR. LOCKETT: Objection,
6    leading.
7    BY MR. PRESENT:
8    Q.   Is that something you saw happen?
9         MR. LOCKETT: Objection,
10   leading, lack of foundation, assumes facts not
11   in evidence.
12   BY MR. PRESENT:
13   Q.   Do you understand my question?
14   A.   Yeah.
15   Q.   Would those cars come back to the yard
16   then like I asked?
17   A.   Come back to the yard.
18   Q.   Did they come back to the barney yard?
19   A.   Yeah. Um-hum.
20   Q.   Based on the fact that you saw them put
21   the Railroad Friction brakes on there in the
22   repair facility, and they came back to the
23   barney yard, and he would be stopping them
24   there and working up the dust you described
25   for Mark Lockett, are you convinced that would

Page 75

EDDIE VALENTINE, JR.
1
2    happen from time to time?
3         MR. LOCKETT: Objection,
4    leading, lack of foundation, misstatement of
5    testimony.
6         MR. PRESENT: I don't agree
7    with any of those things he said.
8         MR. LOCKETT: You
9    wouldn't. That's okay.
10   BY MR. PRESENT:
11   Q.   So, you believe that would happen then
12   from time to time?
13   A.   Yes.
14   Q.   So, when he would stop those brakes at
15   the barney yard with his teaser, or whatever
16   he was using to stop the car, would that
17   process affect the atmosphere in any way?
18        MR. LOCKETT: Objection.
19        THE WITNESS: Yeah.
20        MR. LOCKETT: Objection,
21   leading, misstatement of testimony, lack of
22   foundation.
23   BY MR. PRESENT:
24   Q.   How would it affect the atmosphere?
25   A.   When you pull up on the brake they gonna

Page 76

EDDIE VALENTINE, JR.
1
2    make the friction. They're going to wear the
3    brake.
4    Q.   Then what would happen?
5    A.   Sometimes if it's going real fast you
6    got air and sand where you can get some
7    friction on the thing, and also stopping the
8    rail from rolling. You got air, and you got
9    the dust from the car, the coal dust, and
10   everything else. Smoke too.
11   Q.   From what you could see when that would
12   happen, would there also be dust from the
13   brakes?
14        MR. LOCKETT: Objection,
15   leading.
16        THE WITNESS: Yeah. Dust
17   going to come out -- like I said, all the dust
18   that's around them cars.
19   BY MR. PRESENT:
20   Q.   So, it would be a mixed dust?
21        MR. LOCKETT: Objection,
22   leading.
23        THE WITNESS: Yeah. A
24   mixed dust.
25   BY MR. PRESENT:

Page 77

EDDIE VALENTINE, JR.
1
2    Q.   I guess anybody in that area, would they
3    breathe the dust?
4         MR. LOCKETT: Objection,
5    leading, assumes facts not in the evidence,
6    lack of foundation.
7         THE WITNESS: Yes.
8         MR. LOCKETT: Should I
9    swear you in, Eliot?
10        MR. PRESENT: Mr. Lockett,
11   I know you were joking. I do appreciate your
12   sense of humor. I'm done. Is there anybody
13   in person or on the phone that wants to ask
14   questions?
15        MR. LOCKETT: Yes.
16        MS. LOMBARDO: I do,
17   Eliot. Mark can go first.
18            - - -
19        EXAMINATION
20            - - -
21   BY MR. LOCKETT:
22   Q.   Mr. Valentine, when you were in the car
23   shop you were never in that car shop with Mr.
24   Perry; is that correct?
25   A.   No.

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

ALICE W. PERRY &amp;          :
GEORGE A. PERRY,           :
CO-ADMINISTRATORS OF       :
THE ESTATE OF GEORGE       :
PERRY, DECEASED, AND       :
WIDOW IN HER OWN RIGHT:
     Plaintiffs          :
                 :
      vs.                 :
                 :
A.W. CHESTERTON, INC.,:
et al               .:
     Defendants           :   NO. 95-CV-1996

- - -

Tuesday, February 23, 2010
- - -

      Oral Deposition of JAMES H.
CLARKE, taken at the Marriott Waterside, 235
East Main Street, Norfolk, Virginia commencing
at 10:00 a.m., before Janice L. Welsh, Court
Reporter and Notary Public; in and for the
Commonwealth of Pennsylvania.

\* \* \*

VERITEXT NATIONAL COURT REPORTING COMPANY
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, Pennsylvania 19103

Page 14

JAMES H. CLARKE

1
2      MR. LOCKETT:  You can show
3   me at a break.  Fair enough?
4      MR. PRESENT:  Yeah.  It was
5   just the caption.
6   BY MR. LOCKETT:
7      Q.   At the time you retired, who were you
8   working for in 1994?
9      A.   New York City School Board.
10      Q.   You were living in Manhattan then?
11      A.   No.  I was living in Queens.
12      Q.   During what time period did you work for
13   the New York City School Board?
14      A.   From '68 to '94.
15      Q.   What was your job there?
16      A.   Fireman.
17      Q.   Before you worked for the New York City
18   School Board who did you work for?
19      A.   Chesapeake & Ohio Railroad.
20      MR. PRESENT:  Just so the
21   record is clear, although this may be public
22   knowledge already, both Mr. Clarke and Mr.
23   Valentine have their own nonmalignant asbestos
24   cases and my office represents both gentlemen
25   in those cases.

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 16

JAMES H. CLARKE

1
2   railroad until the time you left in 1968?
3      A.   From 1955 to '60 we ran short of work
4   and they loaned you out to merchandise pier
5   and then your title become freight handler.
6      Q.   Freight handler?
7      A.   Yes.  Can I go back?
8      Q.   Sure.
9      A.   I wrote one year to get the beginning of
10   my records on the railroad, and the last time
11   I wrote they sent me a record that I worked at
12   Railway Express Company in 1947, but it was
13   like I was out of school for the summer.
14      Q.   It was a summer job that you had?
15      A.   Right.  But they never put it on there
16   until the last time I wrote for the record.
17      Q.   That's when you ordered your social
18   security?
19      A.   That's when they say I started at the
20   railroad.
21      Q.   After your job working at the
22   merchandise pier as a freight handler, what
23   was your next job?
24      A.   I went back to barney yard brakeman.
25      Q.   As a brakeman?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 15

JAMES H. CLARKE

1
2      MR. LOCKETT:  I'll note
3   that.
4   BY MR. LOCKETT:
5      Q.   What years did you work for -- we'll
6   call Chesapeake & Ohio C&O.
7      A.   Okay.
8      Q.   What years did you work for C&O?
9      A.   From '55 to '68.
10      Q.   What was the first job you held at C&O
11   Railroad?
12      A.   Barney yard brakeman.
13      Q.   What years did you hold that job, sir?
14      A.   '55 to '68.
15      Q.   Did you have a particular position?
16      A.   The way it worked on the barney yard is
17   you had seniority enough to take a switchman's
18   job, or a brake leader's job, or a foreman's
19   job.  If your seniority stood for that, that's
20   the way it worked.
21      Q.   So, the job you held there depended on
22   seniority?
23      A.   Right.
24      Q.   Can you tell me all the different jobs
25   that you held from the time you started at the

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 17

JAMES H. CLARKE

1
2      A.   Yes.  In other words, if one slacks up
3   then another catch -- you know, you go back
4   and forth.
5      Q.   You went back and forth between the
6   barney yard and --
7      A.   And the merchandise pier, yes.
8      Q.   When you went back to the barney yard as
9   a brakeman, what time period was that for?
10   Was that until you left the railroad in 1968?
11      A.   That was in '60 when I was loaned out.
12   Then you work for while, and then they send
13   you back to the barney yard.
14      Q.   So, you went back and forth?
15      A.   Right.  Until '68.
16      Q.   Just so I'm clear, from 1955 to 1968 you
17   worked in essentially two areas with the
18   railroad?
19      A.   Right.
20      Q.   Freight handler working at the
21   merchandise pier, and also as a brakeman at
22   the barney yard?
23      A.   Yes, sir.
24      Q.   Did you know George Perry?
25      A.   Yes.  His brother and I got hired the

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

JAMES H. CLARKE

1
2  same day and we were one digit behind each
3  other in seniority. His number was 956864 and
4  mine -- no, mine was 956864 and he was 956863.
5  Q.  That was his brother?
6  A.  Perry's brother. Perry came after we
7  went to the barney yard.
8  Q.  So, Perry worked for the railroad after
9  you had already been there; is that correct?
10  A.  Yes.
11         MR. PRESENT:  You mean he
12  came to work there after you started?
13         THE WITNESS:  After I
14  started, yeah.
15         MR. PRESENT:  The question
16  wasn't clear to me. I don't mean to correct
17  your speech or anything. I just wanted to --
18  you know I like things clarified.
19         MR. LOCKETT:  Of course.
20  BY MR. LOCKETT:
21  Q.  Do you have a recollection as to what
22  position Mr. Perry worked, or what jobs he
23  held when he worked for the railroad when you
24  were there?
25  A.  You didn't hold just a brakeman's job

JAMES H. CLARKE

1
2  and that's all. We road cars. You know, an
3  individual car across the scale to get the
4  weight of the code. Then they would dump it
5  on the conveyer belt and it carries it out to
6  the ship.
7         MR. PRESENT:  For a time he
8  had the title of brakeman though. Wasn't that
9  his title?
10         THE WITNESS:  His title was
11  brakeman, yes.
12  BY MR. LOCKETT:
13  Q.  So, the time period you worked at the
14  railroad with Mr. Perry he was a brakeman as
15  well?
16  A.  Yes.
17  Q.  And it's your testimony he rode cars
18  with you across scales that were weighed, and
19  those cars carried coal?
20  A.  Coal, yeah.
21  Q.  Did they carry anything else other than
22  coal?
23  A.  No.
24  Q.  The cars would then be weighed and then
25  they would be dumped where?

JAMES H. CLARKE

1
2  A.  In the hopper up on the pier.
3  Q.  You mentioned the pier. What pier would
4  that have been, sir?
5  A.  It would have been Pier 15, Pier 9, or
6  Pier 14. I never worked on Pier 9. So, you
7  can just forget about that. That was before
8  my time. It was still there, but they wasn't
9  using it.
10  Q.  So, two piers?
11  A.  14 or 15.
12  Q.  Did you work on those piers with Mr.
13  Perry?
14  A.  Yes.
15  Q.  What did they do on those piers, 14 and
16  15?
17  A.  The same thing that I was telling you,
18  rode the car across the scale, get the weight,
19  they dump them, and then carries it out to the
20  ship.
21  Q.  Was it always coal that they carried?
22  A.  Coal, yeah.
23  Q.  Do you recall whether Mr. Perry smoked
24  cigarettes?
25  A.  If I said no I don't know if I would be

JAMES H. CLARKE

1
2  right or not.
3  Q.  I don't want you to guess. Do you know
4  one way or the other?
5  A.  I can't say that I saw him smoke.
6  Q.  You left the railroad in 1968. Did you
7  see Mr. Perry after that?
8         MR. PRESENT:  Did you ever
9  see George after you left the railroad in
10  '68?
11         THE WITNESS:  Yes. But
12  not on the job.
13  BY MR. LOCKETT:
14  Q.  Did you socialize with him?
15  A.  No. I socialized with his brother, but
16  I never socialized with him.
17  Q.  Do you recall the last time you saw or
18  spoke with Mr. Perry?
19  A.  No. I can't tell you that.
20  Q.  I want to go back and focus on that time
21  period you worked as a freight handler.
22  A.  Okay.
23  Q.  What did you do as a freight handler?
24  Can you describe that for me.
25  A.  They were doing a lot of lend-lease

Page 22

JAMES H. CLARKE
1
2  freight like meal, flour, and they had that
3  handshake thing on the bags. That's why I
4  said lend-lease. We were taking them out of
5  the freight car and putting them on the pier
6  for the longshoremen.
7  Q.   Once you put it on the pier then the
8  longshoremen would load it into the ships,
9  correct?
10  A.   Right. Well, it didn't have to be the
11  flour. Just anything that C&O was shipping.
12       MR. PRESENT: This was corn
13  meal and flour, right?
14       THE WITNESS: Yes. You
15  might have had herring and mackerel. They
16  would come in barrels.
17  BY MR. LOCKETT:
18  Q.   As a freight handler what were your
19  responsibilities? What was your job
20  responsibilities?
21  A.   Taking it out of the car to put it on
22  the pier. The longshoreman takes it from
23  there.
24  Q.   Was that done by hand?
25  A.   We used to put them on a pallet. The

Page 23

JAMES H. CLARKE
1
2  forklift picks them up and takes them out of
3  the car.
4  Q.   During the time period you worked as a
5  freight handler working at the pier, did you
6  work with Mr. George Perry at all?
7  A.   I don't think so. I don't know whether
8  George worked at the pier or not.
9  Q.   You don't have any recollection of
10  seeing him there working with you, do you?
11  A.   On the pier, no.
12  Q.   You never worked with him as a freight
13  handler?
14  A.   Not that I can remember.
15  Q.   So, it would be correct to say that your
16  work experience with Mr. George Perry was
17  working as a brakeman moving the cars onto the
18  scales and then dumping the coal into the
19  hoppers?
20  A.   Yeah.
21       MR. PRESENT: My only
22  objection, and I think this is a form
23  objection -- is that that may not encompass
24  all that they did. It's a general description
25  of what they did.

Page 24

JAMES H. CLARKE
1
2       MR. LOCKETT: I'm going to
3  ask.
4       MR. PRESENT: In that sense
5  I'm objecting. If you're intending to
6  summarize everything they did as a brakeman
7  then I object.
8  BY MR. LOCKETT:
9  Q.   Were there other things that you did
10  with Mr. George Perry as a brakeman other than
11  what we just described?
12  A.   If he was working as a teaser then he
13  would be doing something different, but it
14  would still be a brakeman's job.
15  Q.   What did a teaser do?
16  A.   In other words, we used to walk up the
17  track, get on the car and knock the brake, and
18  he had a teaser that he teased it off the car
19  with.
20  Q.   Why would you have to knock the brakes
21  as a teaser?
22  A.   Because you couldn't tease it with the
23  brakes on it.
24  Q.   By knocking the brakes with the teaser
25  what did that do?

Page 25

JAMES H. CLARKE
1
2  A.   No I would knock the brakes. I would be
3  up on the brake. When I knocked the brake
4  then he takes the teaser and teases the car
5  off, to start it off, for me to ride it across
6  the scales.
7  Q.   Does that process move the car?
8  A.   Yes.
9  Q.   Are there any other job activities or
10  functions that you did with Mr. Perry other
11  than those two things you described?
12  A.   No. Nothing else
13       MR. LOCKETT: Are you all
14  right with that?
15       MR. PRESENT: I have never
16  had any major disappointments with you, Mr.
17  Lockett. I thought that we needed to go into
18  further details on that other question.
19       THE WITNESS: They had a
20  car that you didn't have to tease off. Once
21  you knocked the brake, it would move off by
22  itself. That was what they call ball
23  bearing. It didn't have a gearbox.
24  BY MR. LOCKETT:
25  Q.   When you worked with Mr. George Perry

Page 26

JAMES H. CLARKE

1  riding the cars, taking them to the scales,
2  did you ever observe Mr. Perry work with or
3  near any asbestos-containing products?
4  A.   If they had asbestos brakes on them he
5  was working near them.
6  Q.   You said if they had asbestos brakes.
7  What do you mean by that?
8  A.   If the brake shoes on the car was
9  asbestos.
10 Q.   Do you know whether the brakes on the
11 railcars contained asbestos?
12 A.   Some of them, um-hum.
13 Q.   You said some of them.
14 A.   To tell you the truth, I really don't
15 know unless they was metal.
16 Q.   So, you're saying there were two types
17 of brakes?
18 A.   Yes.
19 Q.   There were metal brakes?
20 A.   And asbestos.
21 Q.   Can you describe for me how Mr. Perry
22 would be working with or near brake shoes?
23 A.   He would be right down by the brake
24 shoes if he was teasing, and he's around it if

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 27

JAMES H. CLARKE

1  he wasn't teasing.
2  Q.   How close would he be to the brake shoe?
3  A.   He would be right at the brake shoe if
4  he was teasing. He had to tease up under the
5  rear wheels.
6  Q.   What would he use to tease the railcar?
7  A.   A teaser.
8  Q.   Can you describe that?
9  A.   They have a tool they call a teaser.
10 Q.   Was it a piece of equipment?
11 A.   Yes.
12 Q.   What was it made out of?
13 A.   The handle was I guess about five feet
14 long, but the teaser itself was metal and it
15 worked up and down like that it would push the
16 wheel off.
17 Q.   Where would he place the teaser in order
18 to --
19 A.   On the rear wheel.
20 Q.   Once he did that that would disengage
21 the brake. Is that what you're saying?
22 A.   No. The person that's riding the car
23 would disengage the brake. He would push down
24 on the teaser and push it right off to start

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 28

JAMES H. CLARKE

1  it. It's made on an incline. You know, the
2  tracks was on an incline, and they roll right
3  on down to the scale house.
4  Q.   When he applied the teaser how far away
5  was he from the brake shoes? Do you know?
6  A.   About two or three feet. Or maybe
7  closer. I never measured it. You're pretty
8  close.
9  Q.   When you were working on the railcars
10 with Mr. Perry to move them into the scale
11 area at the barney yard, were you able to tell
12 what type of brake was on the railcar by
13 looking at it?
14 A.   Yeah. You could tell because they were
15 a solid metal. One of them was. The other
16 one looks like it's put together.
17 Q.   What do you mean by that it's put
18 together?
19 A.   Like little holes and stuff in the stuff
20 like it was pressed together.
21 Q.   How do you know that asbestos brakes
22 were used at the railroad?
23 A.   How did I know?
24 Q.   How do you know that?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

Page 29

JAMES H. CLARKE

1  A.   Because they used to tell us.
2  Q.   Who told you that?
3  A.   The foreman.
4  Q.   Are you able to identify the names of
5  any manufacturer or brand names of any of the
6  brakes that were used on the railcars?
7  A.   I know one that I used to see was
8  Bendix.
9  Q.   How do you know it was Bendix?
10 A.   It was written somewhere near or around
11 it.
12 Q.   Any others other than Bendix that you
13 recall seeing at the rail yard?
14 A.   I have seen several of them, but to
15 remember I can't say.
16 Q.   Did Mr. Perry, based upon your
17 observations, work with or near brake shoes in
18 any other capacity other than teasing the
19 railcars while you worked with him?
20 A.   No. He didn't have any other reason to
21 be near the shoes. I mean, you didn't replace
22 them or nothing.
23 Q.   As a brakeman it wasn't your job
24 responsibility to change brake shoes, correct?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 302-571-0510 ~ 610-434-8588 ~ 888-777-6690

JAMES H. CLARKE

1
2  A.   No.  All that was done in the shops.
3  Q.   Do you recall any other
4  asbestos-containing products that you observed
5  Mr. Perry work with or near at the C&O
6  railyard other than the brake shoes?
7  A.   No.
8  Q.   How about when you worked with him up on
9  Pier 14 or 15, do you recall ever observing
10  Mr. George Perry work with or near any
11  asbestos-containing products?
12  A.   Well, you see if you was a brakeman I
13  don't think -- the teaser is about the only
14  thing that you would be near.  Teasing the
15  cars and braking the car was just about the
16  only thing the brakeman do, other than they
17  have a switchman job and all of that.
18       Then they created another job
19  before I left of empty cars going back to the
20  return track after they dumped.  They had a
21  retarder that squeezed them going down the
22  yard and slowed them up and stopped them.
23  Q.   Is that something Mr. Perry did?
24  A.   If his seniority called for it that day
25  he could do it.

JAMES H. CLARKE

1  both of us was in the extra board we had to
2  run into each other every once in a while.
3  Q.   Are you able to recall what years they
4  were that you worked with him in the barney
5  yard?
6  A.   Around the first years that he came
7  there.  From what I can understand he came
8  there in 1967 and I didn't leave until '68.
9  So, I didn't work too much with him.
10       MR. PRESENT:  Don't you
11  mean '57 for Mr. George Perry?
12       THE WITNESS:  Oh, did he
13  come in '57?
14       MR. PRESENT:  That's what
15  my records indicate.
16       THE WITNESS:  Well, if he
17  came in 57 I worked with him quite often.
18  BY MR. LOCKETT:
19  Q.   You're guessing that you worked with him
20  quite often.  I want to know what you recall.
21       MR. PRESENT:  Objection to
22  your characterization of how he is
23  testifying.  He said he worked with him quite
24  often.  He did make a mistake on the date, at

JAMES H. CLARKE

1
2  Q.   Did you ever observe him doing that?
3  A.   No.
4  Q.   How often would you work with Mr. George
5  Perry at the barney yard?
6  A.   Not too much.  He came about two years
7  after me.  You had a certain amount of people
8  that used to work like the 4:00 shift, and
9  then you had some that loved working in the
10  morning at 8:00, and then you had some that
11  wouldn't work nothing but 12:00 at night until
12  8:00 in the morning.  He usually worked the
13  shifts that I didn't like.
14  Q.   He worked different shifts that you did
15  generally.  Is that what you're saying?
16  A.   Yeah.  In other words, if you was a
17  regular man working or an extra man -- the
18  extra man has to be called to work.  The
19  regular man has a regular job.  He goes on
20  that shift every day.
21  Q.   Are you able to estimate how often you
22  worked with Mr. George Perry at the barney
23  yard?
24  A.   I didn't work with him too much, but I
25  worked with him quite often.  Like I say, if

JAMES H. CLARKE

1  least based on the records that I have.
2       MR. LOCKETT:  I'll rephrase
3  it.
4  BY MR. LOCKETT:
5  Q.   Do you recall, Mr. Clarke, how
6  frequently you worked with Mr. George Perry as
7  a brakeman?
8  A.   Like if I worked a year I would say
9  about four or five months out of the year off
10  and on I probably worked with him.
11  Q.   Is that four to five times a year?
12       MR. PRESENT:  Four or five
13  months out of the year off and on.  I heard
14  it.  So, I wanted to make sure you heard it.
15       THE WITNESS:  His brother,
16  now I worked with him every day.
17  BY MR. LOCKETT:
18  Q.   We're talking about Mr. George Perry.
19  A.   I know.
20       MR. PRESENT:  You knew
21  Arthur better, but you knew George too?
22       THE WITNESS:  Yeah.
23       ---
24       (Whereupon a short recess

EXHIBIT C

From:JAMS                    617 228 0222          09/27/2012 10:36    #856 P.001/003





www.jamsadr.com

**THE RESOLUTION EXPERTS**

Offices Nationwide

# FAX COVER

| To: | Phone: | Fax: |
|---|---|---|
| Andrew S. Wainwright Esq.<br>Thornton & Naumes, LLP | 617-720-1333 | 617-720-2445 |
| John E. Young Esq.<br>Flynn Wirkus Young, PC | 617-773-5500 | 617-773-5510 |

| **From:** | Roxanne Zinkowitz | **Phone:** | 617-228-9124 |
|---|---|---|---|
| **Date:** | September 27, 2012 | **Pages (Including Cover)** | 3 — *CORRECTED 1st PG* |

**Comments:**

Re:  GARY P. MANSER , et al. v, METROPOLITAN LIFE INSURANCE CO. et al, CA 11-4609

Dear Counsel,

Judge Hely has asked that I forward you his ruling on the Motion for Summary Judgment of American Premier Underwriters (f/k/a Penn Central Corp. and Consolidated Rail Corp.).

If you have questions, please contact this office.  Thank you.

Roxanne

This facsimile transmission is confidential. If you have received this transmission in error, please notify the sender at the number listed below and discard the transmission. Thank you for your assistance.
**One Beacon Street • Suite 2300 • Boston, MA 02108 • TEL 800.400.3773 • FAX 617.228.0222**

From:JAMS                     617 228 0222              09/27/2012 10:37      #856 P.002/003

Commonwealth of Massachusetts
Superior Court

Middlesex Asbestos CA 11-4609

GARY P. MANSER   et al.

v.

METROPOLITAN LIFE INSURANCE CO. et al.

MEMORANDUM OF DECISION AND ORDER ON MOTION FOR SUMMARY
JUDGMENT OF AMERICAN PREMIER UNDERWRITERS (f/k/a Penn Central Corp.
and Consolidated Rail Corp.)

The brakes on the railroad cars were not appurtenant to the locomotive. As noted
in the *Moneypenny* decision, a railroad locomotive is a self-propelled rail vehicle
designed to pull other cars. A railroad car is a separate carriage that is generally pulled or
pushed by a locomotive because it is not self-propelled. The railroad car brakes on the
cars in this case were part of an integrated air brake system designed for the safe
operation of the entire train, not just the locomotive. Although the brake controls for a
multi-vehicle train are on the locomotive, the brake system is an integrated train system,
not an integrated locomotive system. The car brakes are an appurtenant to a train brake
system, but they are not an appurtenant to the locomotive. For this reason state law tort
liability is not preempted by the Federal Locomotive Boiler Inspection Act.

The Federal Safe Appliances Act does not preempt this state court action. The
SAA and the appliance requirements imposed by the SAA do not preempt state tort
liability based on the brake-based claims in this case.

Under Massachusetts negligence law, the scope of a workplace property owner's
reasonable care duty will depend on the reasonably foreseeable risks of injury to other
persons. Whether the rail yard owner's duty in this case extended to an employee's
household member will depend in part on the nature of the activities at the rail yard, the
nature of the risks involved, and whether the yard owner could reasonably have been
expected to anticipate an unreasonable risk to household members. In the present case,
these fact questions cannot be fairly determined on the basis of the defendant's summary
judgment motion.

With respect to William Manser's exposure to asbestos while working at the
defendant's yard, the plaintiff has pointed to sufficient evidence to raise a genuine issue
of material fact on whether his work on brakes, his picking up of old brake shoes and
other tasks exposed him to asbestos in the products he was handling. The evidence on
this includes the testimony of the two co-workers, William Manser's statements to his
doctor, David Christiani, M.D. (July 11, 2006, letter), and the records regarding asbestos
in Cobra brakes. The court would not necessarily exclude from evidence the testimony
about asbestos being in brake shoes if the testimony comes from a worker who had

From:JAMS                          617 228 0222              09/27/2012 10:38      #856 P.003/003

sufficient day-to-day familiarity with the product.

<u>Order</u>

The motion for summary judgment of American Premier Underwriters is denied.

September 26, 2012

Charles J. Hely
Justice

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT
CIVIL ACTION
NO. 01-5525

CHARLES F. MONEYPENNY and DIGNA MONEYPENNY

vs.

METROPOLITAN LIFE INSURANCE, CO., ET AL.

### MEMORANDUM OF DECISION AND ORDER
### ON DEFENDANT THE BUDD COMPANY'S MOTION TO DISMISS

### INTRODUCTION

The plaintiff Charles F. Moneypenny ("Moneypenny") brings this action against

defendant, The Budd Company, Inc. ("Budd"), among various defendants, for personal injuries

arising out of his exposure to asbestos in the course of his employment by CSX Transportation,

Inc., Penn Central Corporation and elsewhere.  He has asserted claims of negligence and breach

of expressed and implied warranties against Budd.  Pursuant to Mass. R. Civ. P. 12(b)(1) and

12(h)(3), Budd now moves to dismiss.  For the reasons discussed below, the motion is denied.

### BACKGROUND

The relevant facts are taken for the most part from Moneypenny's memorandum in

opposition to the motion to dismiss.  Due to the fact that this is an asbestos case, the complaint

itself is a bare-bones pleading.  For purposes of the motion to dismiss, Budd appears not to

contest the facts stated in Moneypenny's memorandum, and for purposes of the motion only, I

accept them as true.  Moneypenny was employed as a car cleaner and a car man by Penn Central

Railroad and Amtrak at the South Bay Rail Yard and South Station in Boston, Massachusetts in

the 1970s and early 1980s.  He claims that he was exposed to various defendants' asbestos-

containing materials during his employment.  Moneypenny has been diagnosed with malignant

mesothelioma, a very rare and virtually always fatal form of cancer; Moneypenny alleges the only established cause is exposure to asbestos. He performed maintenance and cleaning aboard passenger rail cars manufactured by Budd and allegedly was exposed to dusty ceiling and wall insulation, dust from wrapped steam pipes that ran beneath the seats and dust from drilling transit board in electrical lockers. Budd manufactured or sold for use in the railroad industry completed railcars, some of which were passenger cars and some of which contained a self-propelling motor and therefore, may be classified in locomotives.

<u>DISCUSSION</u>

Pursuant to Mass. R. Civ. P. 12(b)(1) and 12(h)(3), Budd contends that Monneypenny's claims should be dismissed because Federal law preempts his State law causes of action and therefore this court lacks subject matter jurisdiction over this case. According to Budd, the various Federal statutes regarding the railroad industry such as the Safety Appliance Act ("SAA"), the Locomotive Boiler Inspection Act ("BIA"), the Federal Railroad Safety Act ("FRSA")[1] and the Federal Employers Liability Act ("FELA"), along with their accompanying regulations, occupy the field of all matters related to railroad equipment. Budd further alleges that Moneypenny's claim focus on the "design," "construction," and "material" of trains, and therefore, fall squarely within the Secretary of Transportation's authority under these statutes, and so within the preempted field.

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. It has been well settled that State

---

[1] Congress enacted the Safety Appliance Act in 1893, the Locomotive Boiler Inspection Act in 1911, and the Federal Railroad Safety Act in 1970. The FRSA, SAA, and BIA are now codified together at 49 U.S.C. § 20101-20144, § 20301-20306, and § 20701-20903, respectively.

2

law conflicting with Federal law is "without effect." *Cipollone v. Liggett Group, Inc.*, 505 U.S.

504, 516 (1992) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "The question of

preemption is basically one of congressional intent." *Barnett Bank v. Nelson*, 517 U.S. 25.

(1996). Therefore, when Federal preemption is invoked under the directive of the Supremacy

Clause, it is up to the court to determine the presumed intent of Congress.

In the interest of preventing unintended encroachment on the authority of the States,

preemption is not favor unless it is "the clear and manifest purpose of Congress." *Rice v. Santa*

*Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "The burden is on the party seeking to displace

the State action to show preemption with hard evidence of conflict based on the record." *Sawash*

*v. Suburban Welders Supply Co., Inc.*, 407 Mass. 311, 315 (1990) (quoting *Commonwealth Elec.*

*Co. v. Department of Pub. Utils.*, 397 Mass. 361, 376 (1986)). "State law is not preempted

merely by reference to some vaguely defined Federal policy, or on the ground that Congress has

enacted a statute which is tangentially relevant to the subject at issue." *Arthur D. Little, Inc. v.*

*Commissioner of Health & Hosp. of Cambridge*, 395 Mass. 535, 545 (1985). Thus, the court is

reluctant to find preemption unless Federal law does more than "touch upon" or "relate to" the

subject matter of relevant State law; "preemption will lie only if the federal regulations

'substantially subsume' that subject matter." *Carrillo v. ACF Indus.*, 20 Cal. 4th 1158, 1173

(1999), *cert. denied*, 528 U.S. 1077 (2000).

The question here is whether Congress has indicated an intention to occupy the entire

field of railroad equipment through its various laws and regulations.  The preemptive effect for

railroad safety is set forth in the FRSA:  "A State may adopt or continue in force a law,

regulation, or order related to railroad safety until the Secretary of Transportation prescribes a

regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. §

20106. The word "cover" is a "restrictive term that means substantially subsuming the subject matter." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

At the hearing on this motion, counsel for both parties appeared to agree that the FRSA essentially includes the BIA and the SAA but does not add any independent provisions that may apply in this case. Accordingly, both sides focus their arguments on the two separate statutes, the BIA and the SAA. Budd correctly notes that courts have on more than one occasion allowed preemption under the BIA or the SAA. See, e.g., *Law v. General Motors Corp.*, 114 F.3d 908, 909 (9th Cir. 1997) (plaintiff's common law claims against locomotive manufacturers for injuries allegedly caused by design defects were preempted by the BIA since warnings and designs are "within the scope of the Secretary's authority"); *Green v. River Terminal Ry. Co.*, 585 F. Supp. 1019, 1027 (N.D. Ohio 1984), *affirmed*, 763 F.2d 805 (6th Cir. 1985) ("federal regulation of locomotive equipment under the Boiler Inspection Act is preemptive of any state or local regulation on the same subject"); *Scheiding v General Motors*, 22 Cal. 4th 471 (2000), *cert. denied*, 121 S. Ct. 383 (2000) (applied preemptive effect of the SAA, stating that "Congress intended federal law to occupy the field of locomotive equipment and safety"); and *Carillo v. ACF Indus.*, supra, 20 Cal. 4th at 1173 (SAA preempts state regulation of guardrails on rail freight cars). However, I am not persuaded that preemption principles require the dismissal of Moneypenny's State law tort claims in this case.

From the complaint and the arguments of counsel, I understand that Moneypenny worked at least primarily on rail cars, not locomotives. The BIA provides broad regulatory authority governing locomotives and their parts and appurtenances.[2] The Congressional purpose in

---

[2] The BIA provides, in relevant part, as follows:

4

enacting the BIA was the protection of train employees and passengers from defective locomotive boilers and equipment. See, e.g., *Urie v. Thompson*, 373 U.S. 163 (1949). There is substantial authority for the proposition that Congress intended Federal law to occupy the field of locomotive equipment and safety, particularly as it relates to injuries suffered by railroad workers in the course of their employment. *Law v. General Motors Corp., supra*, 114 F.3d at 910. The United States Supreme Court has held that the BIA "extends to the design, the construction, and the material of every part of the locomotive and tender, and of all appurtenances." *Napier v. Atlantic Coast Line R. Co.*, 272 U.S. 605, 611 (1926). However, the BIA does not preempt claims arising from asbestos on rail cars. A rail car is not the same as a locomotive.[3] Only those track vehicles that are self-propelled, and which perform the function of locomotion, may be considered "locomotives" under the BIA. See *AT&SF Ry. v. United States*, 403 F.2d. 211 (10th Cir. 1973).[4]

---

A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its part and appurtenances –

(1)  Are in proper condition and safe to operate without unnecessary danger of personal injury ...

49 U.S.C. § 20701.

[3] "Rail car means a non-self-propelled vehicle designed for and used on railroad tracks." 40 CFR § 201.1

Locomotive is a "self-propelled unit of equipment designed for moving other equipment in revenue service and includes a self-propelled unit designed to carry freight or passenger traffic, or both." 49 CFR § 221.5.

[4] Budd also claims that the Federal Railroad Administration has jurisdiction over the exposure of rail employees to air contaminants and in its 1996 FRA Report to Congress, *Locomotive Crashworthiness and Cab Working Conditions*, the "FRA recommends no action to be taken on the issue of asbestos in locomotives." This is not disputed. But the primary if not sole issue in this case is asbestos in rail cars, not locomotives.

Moneypenny's second argument relies on the fact that the BIA only refers to "railroad carriers" and nowhere in the Act are equipment manufacturers mentioned. Thus, argues Moneypenny, the BIA does not preempt claims against railroad manufacturers, and he cites *Lorincie v. Southeastern Pennsylvania*

Budd's argument for preemption under the SAA is unpersuasive. The SAA, although it applies to both locomotives and railcars, requires railroad carriers only to use those vehicles that are equipped with a specific list of safety equipment: automatic couplers, secure sill steps, efficient hand brakes, secure ladders, running boards, handholds, grab irons, drawbars consistent with regulations, and power brakes sufficient to stop the train. 49 U.S.C. § 200302(a). The SAA makes no mention of the types of equipment and materials from which Moneypenny allegedly was exposed to asbestos such as ceiling or wall insulation, pipe wrap, electrical boxes, asbestos brake shoes or any other type of asbestos containing object that may have been used in the manufacture of the cars.

Budd's reliance on *Ouellette v. Union Tank Car Co.*, 902 F.Supp. 5 (D.Mass. 1995), is misplaced since the handholds at issue there are specifically mentioned in SAA, but asbestos insulation is not. The Supreme Court has suggested that the preemptive effect of the SAA extends only to the types of equipment listed in the statute. See, e.g., *Napier v. Atlantic Coastline R. Co.*, *supra*, 272 U.S. 605 (the SAA, due to its specific requirements, does not occupy the entire field of regulating locomotive equipments); *Atlantic Coast Line R. Co. v. State of Georgia*, 234 U.S. 280 (1914) (holding that a Georgia statute requiring headlights on locomotives was not preempted by the SAA because the act did not "provide regulations for locomotive headlights"). As further indicated in *Garay v. Missouri Pacific R. Co.*, 38 F.Supp.2d 892 (D.Kan. 1999):

> The FSAA and its regulations do not provide a definition of "safety appliance," but rather contain a "strikingly specific laundry list" of required equipment for each type of rail car .... Although

---

*Transp. Authority*, 34 F.Supp.2d 929, 933 (E.D.Pa. 1998) (concluding that tort claim against rail cab manufacturer for defective design was not preempted by the BIA). Although I do not agree with such reasoning, there is no need here to go into an analysis of distinctions between carriers and manufacturers. It is already established that the BIA applies only to locomotives, not to rail cars.

6

the Act applies to these specific types of equipment, "[n]o other device, however necessary for safety, falls within its reach."

38 F.Supp.2d at 898 (citations omitted). The *Garay* court concludes that the SAA does not "subsume the entire field of devices which could be deemed safety equipment, but only the subject of those devices which are listed in the statute." *Id.* I agree. Because the SAA does not "cover" or "substantially subsume" the equipment on which Moneypenny is focusing his claims of exposure to asbestos, Budd is not entitled to dismissal of Moneypenny's claims on the basis of preemption by the SAA.

In light of this conclusion, there is no need to consider Budd's argument that if preemption is applied, Moneypenny still has a full and complete remedy for his claims under the FELA. 45 U.S.C. § 51 *et seq.*[5]

## ORDER

For the foregoing reasons, motion to dismiss of the defendant The Budd Company, Inc. is denied.

Margot Botsford
Justice of the Superior Court

Dated: October 21, 2002

---

[5] Section 1 of the FELA provides:

> Every common carrier by railroad while engaging in commerce ...
> shall be liable in damages to any person suffering injury while
> he is employed by such carrier is such commerce ... for such
> injury or death resulting in whole or in part from the negligence
> of any of the officers, agents, or employees of such carrier,
> or by reason of any defect or insufficiency, due to its negligence,
> in its cars, engines, appliances, machinery, track ... or other equipment.

45 U.S.C. § 51.

7

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: ASBESTOS PRODUCTS | : | Consolidated Under |
| LIABILITY LITIGATION (No. VI) | : | MDL DOCKET NO. 875 |
| | : | |
| | : | |
| VARIOUS PLAINTIFFS | : | Certain cases in which |
| | : | Plaintiffs are represented |
| v. | : | by Glasser & Glasser, listed |
| | : | in Exhibit "A," attached |
| VARIOUS DEFENDANTS | : | |

FILED
OCT 10 2012
MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

O R D E R

**AND NOW**, this **10th** day of **October, 2012**, it is hereby

**ORDERED** that the Motions to Dismiss or, in the Alternative,

Motions for Summary Judgment of Defendant Pullman Passenger Car

Company, Inc., listed in Exhibit "A," attached, are **DENIED**

without prejudice.[1]

---

[1]   The 2,350 cases from the Eastern District of Virginia
that are currently before the Court constitute one of the largest
groups of cases still remaining on this Court's multidistrict
litigation docket. On September 19, 2011, the cases were referred
to the Honorable M. Faith Angell, U.S. Magistrate Judge, for
oversight and supervision. See Referral Order, No. 01-md-875
(E.D. Pa. Sept. 19, 2011), ECF No. 8138. In the meantime, the
Kurns case was making its way through the courts, and on February
29, 2012, the Supreme Court issued its opinion in Kurns. Kurns v.
Railroad Friction Products Corp., 565 U.S. ___, 132 S. Ct. 1261
(2012). Subsequently, the Court held a Status Conference with the
parties involved in the present cases from the Eastern District
of Virginia. The Court issued a briefing schedule for Pullman to
file, and Plaintiffs to oppose, motions to dismiss related to
federal preemption and, specifically, whether and, if so, to what
extent, the Kurns decision applied to these cases. See Briefing
Schedule Order, No. 01-md-875 (E.D. Pa. May 19, 2011), ECF No.
8567. After oral argument, the matter is ripe for disposition.
The single Motion that Pullman filed was filed in each case, and
Plaintiffs' Opposition was filed in each case as well. The cases
have never been on scheduling orders, and therefore no discovery
has been conducted in the cases.

Before the Court is the Rule 12(b)(6) motion to dismiss
or, in the alternative, motion for summary judgment of Defendant
Pullman Passenger Car Company, Inc. ("Defendant" or "Pullman").
Def.'s Mot. Dismiss, No. 01-md-875 (E.D. Pa. May 21, 2012), ECF
No. 8590 [hereinafter "Motion"].

Plaintiffs in these cases include former railroad
workers, representatives, survivors, and spouses ("Plaintiffs").
Plaintiffs claim that they were exposed to asbestos-containing
insulation products produced by Pullman that were onboard
passenger railcars. Such insulation products, Plaintiffs claim,
were present in or on the "walls, ceilings, floors, and heating
components" of passenger cars. See Pls.' Mem. Opp., No. 01-md-875
at 5 (E.D. Pa. June 4, 2012), ECF No. 8606 [hereinafter
"Opposition"]. Plaintiffs have said that they "have addressed
these cases as though each and every case addresses the entire
Pullman car, which is a car that has asbestos insulation in the
walls, ceiling, floor and steam pipes." Tr. at 6:12-18, July 26,
2012. Pullman is the only remaining defendant in these cases.

The issue in these cases is whether the Locomotive
Inspection Act ("LIA"), 49 U.S.C. § 20701-20703 (2006), and/or
the Safety Appliance Act ("SAA"), 49 U.S.C. § 20301-20306 (2006),
operate to preempt Plaintiffs' state law claims, especially in
light of the recent Supreme Court decision in Kurns, 132 S. Ct.
at 1261, which affirmed the breadth of the long-standing field
preemption of the LIA.

Pullman argues that Plaintiffs' complaints should be
dismissed because their claims are preempted by the LIA and/or
the SAA. Plaintiffs argue that Kurns and the LIA do not operate
to preempt their claims, as the LIA regulates only self-propelled
locomotives and their tenders, parts, and appurtenances, but does
not specifically govern passenger railcars and equipment thereon.
Plaintiffs further argue that the SAA does not preempt their
state law claims, as it regulates only a specific, finite list of
safety devices.

Pullman's Motion sweeps too broadly. No discovery has
yet taken place in any of the cases in which Defendant filed its
Motion. It has become clear that important facts remain unknown
in these cases. Specifically, it is not clear which products
attributable to Defendant each Plaintiff claims he was exposed
to. See Tr. at 5:3-13, July 26, 2012 ("We don't have specific
allegations of exactly which products, and none of the plaintiffs

2

It is further **ORDERED** that U.S. Magistrate Judge M.
Faith Angell, to whom the cases are referred, and Special Master
Bruce Lassman, Esq., shall place the cases on scheduling orders
and shall manage discovery and other pretrial matters.

AND IT IS SO ORDERED.

_____
EDUARDO C. ROBRENO, J.

---

have been deposed."). For example, at some points in the briefing
and in the hearing on Defendant's Motion, the parties referred to
entire passenger cars as products themselves, whereas at other
times, the insulation materials onboard the passenger trains were
referred to as products.

Each case must be treated individually given its
distinct factual background, and there is a likelihood that
different Plaintiffs might have been exposed to different
products, if any. Without the parties having conducted discovery,
and without knowing which of Defendant's products, specifically,
each Plaintiff allegedly has been exposed to, it is premature for
the Court to determine whether the products to which each
Plaintiff claims exposure would be preempted by the SAA, the LIA,
and Kurns. For example, Plaintiffs allege exposure to asbestos-
containing "insulation products" attributable to Pullman onboard
passenger cars (as opposed to onboard locomotives). "Insulation
products" is a broad category of products, and the answer to, for
example, whether state regulation of heating pipe insulation
onboard a passenger car would be preempted, might well be
different from the answer to whether state regulation of certain
heating components would be preempted.

3